Commonwealth *v.* Craven, Appellant.

Argued October 17, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT JJ.

**438**

*William T. Connor,* with him *John R. K. Scott, Hardie Scott* and *S. Walter Foulkrod, Jr.,* for appellant.

*John A. Boyle,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY BALDRIGE, J., January 30, 1940:

The appellant, Frank A. Craven, was indicted for murder and manslaughter in connection with the death of Frank Camodeca, a prisoner in the Philadelphia County prison at Holmesburg. After a trial lasting eight days, the jury brought in a verdict of not guilty of murder but guilty of involuntary manslaughter. Motion for a new trial was heard by the court in banc and refused.

This appeal is from the sentence imposed of imprisonment from one to three years.

In Philadelphia there are two county prisons. Both were under the immediate management of Superintendent Mills, who had two deputies, one of whom was Craven. His duties were confined to the management and control, under the advice of Mills, of the Holmesburg prison, with which we are concerned. It is built in the form of a wheel, with cell blocks radiating from the center. Between two of these blocks, and entirely separate therefrom, is a one-story building, known as "Klondike," where refractory prisoners are sent at times for punishment, which includes reduced rations and subjection to heat. This building, with one en-

trance on the eastern end, is of brick and concrete construction, 60 feet long, 12½ feet wide, with an inside height of 8½ feet. On the north side of the interior is a 4-foot-wide corridor running the full length of the building, with three double-sash windows and three skylights. On the south side are twelve cells, each 4 feet wide, 8 feet long, and 8 feet high. Each cell is equipped with an iron-grated door, a toilet, and running water, but no furniture, except at nighttime a small mattress is provided. In the roof of each cell is a ventilator, 10 inches in diameter, which is generally open. There are five radiators along the outer wall of the corridor and one on the ceiling at each end of the building. The heat is turned on in the engineroom, located under another cell block, and is regulated by valves, one of which is just inside the building and the others are on the radiators. If the heat is on and all the radiators are turned off, still some heat passes through the building in an uninsulated 2-inch pipe, 60 feet long, attached to the ceiling.

Craven, as assistant superintendent, or warden, had under him a captain of the guards, five or six sergeants, and a number of guards, making a total personnel of one hundred and thirteen employees and officials in charge of this prison, which had approximately fourteen hundred inmates.

About August 15 or 16, 1938, some of the prisoners, in a protest to the food served, went on a hunger strike. Notice thereof was sent to Superintendent Mills who was away on vacation. He returned to the institution on Friday, August 19th, and found some of the prisoners defiant and disorderly. About 11 o'clock that night, the ringleaders of the rebellious prisoners, including Frank Camodeca, were sent to Klondike. Immediately Sergeant Hart, by virtue of a standing order given him some time prior thereto by the defendant, ordered the engineer to turn on the steam. That was the usual custom, even in summertime, as the cells were damp

and it was necessary that some heat be furnished as the prisoners were deprived of all their clothing except light underwear. On Saturday thirteen prisoners and on Sunday six additional ones were removed to Klondike, making in all twenty-five prisoners. From Friday night until at least Sunday afternoon, a 5-pound pressure of steam continuously flowed through the supply lines and radiators. These prisoners were visited three times a day, at approximately 8 a. m., noon, and 5 p. m., when they were given bread and water, the latter having been turned off in the cells, so that for approximately fifteen hours each night they were locked in their cells with all the windows and skylights closed, without water or any means of outside communication.

We will not detail all, only some, of the tortures to which these men were subjected. They testified, and much of their testimony was not denied, that their cells were like ovens, the doors and walls were so hot that it was impossible to touch them without receiving burns, and of their difficulty in breathing. They told of their crowded conditions; in some of these 4-foot-wide cells three men were confined. Camodeca, who weighed 239 pounds, had two cellmates, Spatz and McQuade. Testimony was given of their suffering from thirst and of horrible methods to which they resorted in their unsuccessful efforts to quench it, and of their complaints to the guards, imploring them to have Craven and a doctor visit them. One attempted to commit suicide, another injured his arm, and a third had a cut in his head which, according to his story, was sustained when he "passed out." It is most improbable that Craven, responsible for these prisoners, with knowledge of the serious trouble that had preceded their removal to Klondike, was entirely ignorant of the conditions that existed.

When Monday morning, August 22d, came, the guards made their usual visitation and then they found four

of the twenty-five men dead, including Camodeca and his cellmate McQuade.

Dr. Baldi, the chief physician of the prison, was out of town between August 19th and 22d, returning the morning of the latter date. Learning of the trouble, he hurried over to Klondike and found the heat "tremendous," "unbearable." He immediately had the living prisoners removed from Klondike. One was hysterical, others in a state of collapse, requiring hospitalization, and the rest were more or less seriously affected as a result of the heat and lack of water and food.

Dr. Crane, the coroner's physician, performed an autopsy upon the body of Camodeca. He testified that he had sustained many abrasions, burns, bruises, a cut above one eye, the other severely blackened; that there was congestion of the coverings of the brain and head and of the mucous membrane of the eyes, nose and mouth to such an extent that the blood vessels had ruptured and blood had run down on his cheeks; diffuse hemorrhages were present through the lungs; the heart, kidneys, and surface of the body were congested, indicating contact with extreme heat. He expressed the opinion that, from his examination, death was due to a heat stroke.

The general defense set up was (1) that Camodeca's death was not due to exposure to heat but resulted from a fight in the cell; and (2) that, even if death was due to heat, there was no proof that defendant's conduct amounted to such rashness or recklessness that constituted involuntary manslaughter.

We may state here that there was no testimony of any blows being struck or of any violence. Spatz, the only person in the cell with Camodeca who survived, stated that there had been no fighting, that Camodeca from time to time struggled in his weakened condition to stand and would fall. When found, his face was downward upon the concrete floor.

Coming now to the appellant's assignments of error, the first two are directed to the admission in evidence of complaints of prisoners and of requests to the guards that appellant come to Klondike. This evidence had a bearing on the inmates' sufferings and their efforts to obtain relief during this period. These contemporaneous statements were voluntarily and spontaneously made at the time of the occurrence and under circumstances which dispel the idea of a design or motive for misrepresentation or invention, and were admissible as part of the res gestae. They were made during the existence of the conditions complained of and can rightly be regarded as an exception to the rule that excludes hearsay testimony: *Com. v. Werntz,* 161 Pa. 591, 596, 29 A. 272; *Keefer v. Life Ins. Co.,* 201 Pa. 448, 51 A. 366; *Com. v. Howe,* 35 Pa. Superior Ct. 554; Greenleaf on Evidence, §108, vol. 1, pp. 167, 169.

*Com. v. Duffy,* 49 Pa. Superior Ct. 344, and *Com. v. Williams,* 304 Pa. 299, 156 A. 86, and the other cases cited by the appellant, are so different in their facts that we do not regard them as applicable to the case at hand. Each case must necessarily depend upon its own facts and circumstances to determine whether the rule of res gestae applies: *Com. v. Werntz,* supra.

These assignments cannot be sustained.

The third assignment relates to the trial judge's refusal to admit in evidence the result of an experiment conducted under Dr. Fulton in Klondike. Dr. Fulton was assigned to make an investigation by the State Department of Welfare, with which he is connected. He has been practicing about eight years, specializing in industrial medicine. Dr. Fulton testified that he and four other men had themselves locked in Klondike to determine the cause of Camodeca's death. An examination given them immediately prior to this experiment showed that they were in good physical condition. They ate their lunch and entered Klondike at 5:15 p. m. on

September 1st, where they remained until 11:30 the next morning, about eighteen hours. The heat was turned on when this test began. The entrance door and windows were closed, except for several brief periods. There was no evidence offered of the outside temperature so that a comparison could be made with the weather conditions which prevailed in August during the time the prisoners were confined in Klondike, when, according to a witness from the U. S. Weather Bureau, the temperature ranged from 69 to 88 degrees and "the sunshine was a hundred per cent." Dr. Fulton and his men were not confined to any one cell; they could walk around as they pleased in the corridor. In the evening each was furnished a sandwich and water and their breakfast consisted of coffee, cornflakes, and milk. It is quite apparent that the test given to these men, whose physical condition had not been impaired by a hunger strike, and who were confined for a period of eighteen hours instead of approximately sixty hours as was Camodeca, not crowded in cells, and furnished with a fairly nourishing breakfast, was under distinctly different conditions from those which the prisoners experienced. The result of such a test could not give any aid in determining the issues involved. Experiments under certain conditions are undoubtedly admissible, as, for example, in *Sullivan v. Com.*, 93 Pa. 284, where the court held there was no error in the admission of cloth or muslin used in an experiment to show the effect of powder marks where a pistol had been fired at short range. But while the conditions existing at the time of a test or experiment of this type are not required to be identical with those existing at the time of the occurrence, they must be substantially similar. The appellant cites 8 A. L. R. p. 18, wherein it is stated: "If there is an exact correspondence of such conditions, the experiments will amount to a demonstration, and be conclusive upon the issue; but as such exact correspondence is ordinarily unattainable, allowance must be made

for the dissimilarity of conditions in determining the probative force of the experiments. Such dissimilarity, however, may affect not merely the weight of the evidence, but its *admissibility* ......" (Italics supplied.) See, also, *Thomas, R. S. Co. et al. v. Phila. & R. Rwy. Co.*, 256 Pa. 549, 100 A. 998.

We approve the court's action in excluding from the evidence the results of the test or experiment.

The fourth, fifth, sixth, and seventh assignments complain that the court refused to admit in evidence written statements of Sergeant Hart and Brough, two of the guards, made prior to the trial, so that it might be determined whether they were inconsistent with their testimony. There was no proof of any conflict between their testimony and statements they had made. They admitted they testified to certain facts, to which their attention was not directed when previous statements were made. Hart testified at the trial that he had told Craven that one of the prisoners had asked for a doctor, and he admitted that he had not mentioned that fact in a previous statement as he was not asked in regard thereto. The court permitted appellant's counsel to read to the jury Hart's sworn testimony at the coroner's inquest, for the purpose of showing any alleged inconsistency. No material contradiction appeared. Brough was asked at the trial whether he had told Lieutenant Clark that he had reported to Craven that the prisoners asked for a doctor. He replied that he could not remember. There was no evidence of any variance between this witness' previous statement and his testimony at the trial.

When one's attention is not called to certain facts at the time a statement is made, and subsequently at a trial his attention is directed thereto, it cannot be said that his testimony is in conflict with his former statement, especially when there are as many facts involved as in the instant case. There can be no doubt that where testimony at a trial is clearly inconsistent with

prior statements, evidence thereof is admissible: *Hughes v. D. & H. Canal Co.,* 176 Pa. 254, 35 A. 190; *Com. v. Zervas,* 302 Pa. 510, 153 A. 767; *Smith v. Cohen,* 116 Pa. Superior Ct. 395, 176 A. 869. The court's ruling does not violate that principle.

We do not find any merit in the objection to the court's refusal to admit in evidence the written statements of Hart and Brough.

The eighth assignment complains that the defendant was prejudiced by the cross-examination of the assistant district attorney concerning dereliction of his duties which were unconnected with the charge upon which he was being tried. The defendant was asked, in some detail, in his direct examination, concerning the rioting of prisoners several days before August 19th, the searching of their cells, and other incidents, to show justification for the appellant's ordering the prisoners to Klondike.

For the purpose of testing defendant's credibility, and to support the Commonwealth's contention that the insubordination testified to by him was due to his failure to maintain proper discipline, the defendant was asked on cross-examination, if there had been any trouble between four certain prisoners, and, over objection, he answered that four convicts, who had been unfriendly, came into his office, and, at their request, he permitted them to "fight out their difficulties." He said he felt that might be a good way to settle their differences. This cross-examination did not amount to the proving of a separate and unconnected crime; that was not the Commonwealth's purpose; and we think it did not in any way prejudice the defendant.

It is largely a matter within the discretion of the trial judge to what extent cross-examination will be permitted. A trial judge's failure to limit properly a cross-examination is not grounds for reversal in the absence of apparent injury as a result of the error: *Conley et al. v. Mervis,* 324 Pa. 577, 188 A. 350.

This assignment requires no further consideration.

The ninth and tenth assignments of error complain that the assistant district attorney in his address to the jury characterized Dr. Fulton as a "mountebank" and designated the experiment conducted by him as a "dishonest test." This reference to Dr. Fulton and to his investigation could well have been omitted as that type of advocacy is not commendable. These comments were probably provoked by some of the remarks of one of the attorneys for the defense in his argument to the jury and by the number of interruptions that were made during the course of the assistant district attorney's address. In any event, the trial judge, who has wide powers in the conduct of a trial, is better qualified to pass upon the probable effect on the jury of argument of counsel than we. His action will not be reversed unless it clearly appears that the defendant has been prejudiced by the improper comments: *Com. v. Massarelli*, 304 Pa. 335, 156 A. 101; *Com. v. Davison*, 99 Pa. Superior Ct. 412.

We have read the able arguments made in behalf of the defendant and by the assistant district attorney, which were taken down and transcribed, and we are not convinced that the defendant was harmed by the remarks which are the basis of these assignments. As we said in *Com. v. Wilcox*, 112 Pa. Superior Ct. 240, 255, 258, 170 A. 455: "The labor and expense of a long trial is not to be thrown away because of every unfortunate or ill-timed remark of the Commonwealth's attorney. This is seen by a review of the many cases where such remarks were not considered sufficiently injurious to require a new trial ...... We are confirmed in our judgment by the fact that the verdict of the jury shows a careful and discriminating finding apparently free from all passion and prejudice."

Finally, the appellant asked that a new trial be granted because of the conduct of Hopkins, an alter-

nate juror, and misinformation conveyed by him. Hopkins, on his voir dire, was asked, inter alia, whether he had any acquaintanceship with persons connected with the district attorney's office, and answered in the negative. We are of the opinion, from depositions taken, that he misunderstood the question. It developed that he is a friend of Mr. Barrett of the district attorney's staff, who did not participate in any manner in this trial. It further appears that this alternate juror was excused from jury duty immediately after the charge of the court and did not retire with the other jurors who rendered a verdict. After his release, and while the jury was deliberating, he spoke to some persons in the corridor about what the verdict was likely to be and, according to the depositions of witnesses, he said that the jury had come to a definite conclusion during the early part of the trial. He was not one of the jurors who convicted the defendant and his comments, while injudicious, in no way affected the verdict. There is no evidence that he improperly influenced the other members of the jury, nor does it appear that the alleged misconduct was occasioned by the Commonwealth or on its behalf. A motion for a new trial on this ground was addressed to the court's sound discretion, which, in our judgment was not abused. "The question as to whether or not a juror has been guilty of misconduct, or has been subjected to improper influence affecting the verdict, is a fact to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial, proof of mere opportunity to influence the jury being insufficient": 16 C. J. §2669, p. 1161.

The cases upon which the appellant relies have been examined by us but do not control the instant case.

This court, after a careful consideration of the record and the arguments of able counsel, is of the unanimous opinion that the defendant had a fair trial; the judge's

rulings on the evidence are correct, and his charge clearly and impartially presented to the jury the issues involved. The verdict was fully warranted by the evidence.

Judgment is affirmed, and it is ordered that the record be remitted to the court below and that the defendant appear in said court at such time as he may there be called and that he be by that court committed until he has complied with the sentence or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.