494 A.2d 426

**COMMONWEALTH of Pennsylvania**

v.

**Marc BLACKWELL, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 2, 1984.

Filed June 7, 1985.

204

Thomas L. McGill, Philadelphia, for appellant.

Robert B. Lawler, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, President Judge, OLSZEWSKI and CERCONE, JJ.

SPAETH, President Judge:

This appeal is from judgments of sentence for third degree murder, kidnapping, conspiracy, robbery, and possession of a prohibited offensive weapon. Appellant argues that the trial court erred in admitting hearsay evidence of statements the victim made following his abduction. We have concluded that the evidence was properly admitted, and accordingly, affirm.

On September 18, 1980, Leonard Leichter and his wife, Dorothy Leichter, went shopping at the Acme Market in the Bala Cynwyd Shopping Center in Bala Cynwyd. N.T. 54–55. They arrived at the market at about 8:10 p.m. and parked in an adjoining parking lot about 175 feet from the entrance to the market. N.T. 55. By about 9:00 p.m. they had completed their shopping, and while Mr. Leichter went to get their car, Mrs. Leichter waited outside the market with their packages. Mrs. Leichter testified:

I saw him walk down the drive, kept watching, and he walked to the car, and I saw him go in between the cars, and I kept watching to see the back light to go on so I would know he would be coming back. In the meantime,

my attention was drawn to a little Volkswagen that sort of revved up, and then the light came on and they started to back out. And in the meantime, my husband's car came on, and he started to back out. I thought it was he. And then I took my eyes away from that spot to pick the packages up to get them ready to put them in the car because they were down in the cart as I was picking them up. And then I looked up and he wasn't there. I didn't see what happened after they pulled out partway out of the parking lot.

Q. Your husband's car was gone?

A. Well,—

Q. Your husband's car was gone?

A. They were gone.

N.T. 2.58.

At 9:13 p.m. Mr. Leichter telephoned the police from a telephone booth at Montgomery Drive and Belmont Avenue. At trial, a tape recording of his conversation with the police dispatcher was played, N.T. 2.102, and a transcript of the recording was read, N.T. 2.86–2.93. Mr. Leichter first stated that he "just got held up," and that he was "in the park at the phone booth." N.T. 2.86. The conversation continued:

"Radio: How did it happen?

"Caller: I was coming out of the Acme in Bala, and my wife was waiting, and I walked to my car, and these guys were waiting for me.

"Radio: And what happened?

"Caller: They put me—I can't talk. I have a heart condition.

"Radio: Yeah, well, just—

"Caller: They put me in the car, cleaned me out. They let me out down here.

They had a sawed-off shotgun on me . . .["]

N.T. 2.87–2.88.

Mr. Leichter then described his car, which his assailants had driven off with. N.T. 2.88. The conversation continued:

"Radio: Two males?

"Caller: Yeah, two black ones and—and there was one in a—another one or two in a little Volkswagen was following.

"Radio: What colors on the Volkswagen?

"Caller: It was a ...

"Radio: Go ahead, just take—

"Caller: Like a dirty grayish blue.

"Radio: Uh-hum. Where's your wife, sir?

"Caller: She's up there waiting for me at the Acme.

"Radio: Oh.

"Caller: She must know something happened by now.

"Radio: Yeah; just try, try to relax if you can. they'll be right there.

"Caller: Okay.

"Radio: I'm gonna just keep you on the line.

"Caller: Okay.

. . . .

"Do you have any medication that you could be taking or anything?

"Caller: Yeah, I got a nitro.

"Radio: You got it with you?

"Caller: Yeah, I took one.

"Radio: Okay.

"Caller: I'm having a little trouble breathing.

"Radio: Yeah, I—I know it's tough to relax.

"Caller: Yeah, I—

"Radio: But—but the worst—

"Caller: I was very (unreadable) ...

"Radio: but the worst is over; I mean, at least—

"Caller: Yeah, uh-huh.

"Radio: You know.

"Caller: Yeah, that's all.

"Radio: I—I know it's a frightening experience.

"Caller: The first time I ever had this happen.

"Radio: Yeah. (9:18:35 P.M.)

If you have to go to the hospital, you just tell the police when they get there if that's your condition.

"Radio: No, I don't want—I don't think I have to go to the hospital."

N.T. 2.86–2.91.

As the dispatcher kept him on the telephone awaiting arrival of the police, Mr. Leichter stated on three further occasions that he was having difficulty breathing. N.T. 2.92.

At 9:22 p.m. the police arrived at the telephone booth. At trial Officer James Delaney testified as follows:

I asked him [Mr. Leichter] what had happened. He told me that he was leaving the Acme Market in Bala-Cynwyd en route to his car when he was accosted by two black males, point of shotgun, forced into the car and driven into Fairmount Park where he was dumped out of the car at Belmont and Montgomery Avenue. He went on to state that he believed there was another car involved. He said he felt he was being followed by a blue Volkswagen operated by another black male. I asked if he could give us any more of a description on the males. He said they were teen-agers.

He appeared very upset. He started to cough, seemed like he was very congested. At this point of our conversation, he stated to me that he was a heart patient and that he had just taken a nitroglycerine pill. He seemed short of breath and he said he needed oxygen. At that point, I placed him in the back of the emergency wagon, and we transported him up to the Osteopathic Hospital. N.T. 2.30–2.31.

The drive to the hospital lasted "about two and a half minutes." N.T. 2.31. There, at about 9:30 p.m., Mr. Leichter and the police were met by Mary Beth Reese, an emergency room nurse. N.T. 2.104–2.106. She testified that Mr. Leichter was "very grayish, like an ashy color, and he was like diferetic [sic], like profuse sweating." N.T. 2.107. She stated: "He kept saying, you know, 'Please help me be able to get my breath.'" N.T. 2.107. Nurse Reese further testified as follows:

I asked him, "What happened?" you know, "Could you tell me, you know, why you are so upset?" because he was terribly upset. He just kept saying, "I'm having so much trouble breathing. I'm so frightened." And, you know, he seemed so scared. I never—it was really difficult. I had to requestion him to find out. And then, you know, he said he had gone to the Acme with his wife for groceries, and he came out to go get the car, and there were a couple of guys that came, and you know, took him at gunpoint and robbed him and then took him in the car, then dropped him off. And it was like a couple of times, you know, I had to keep asking him questions. Then I tried to find out, you know, like a medical history, if he was on any medicines for any reasons or allergic in case I gave him something he was allergic to.

From there, we went over and we gave him oxygen and we did a cardiogram. And then we placed him on the cardiac monitor.

N.T. 2.106–2.107.

Mr. Leichter was treated for pulmonary edema, N.T. 2.119–2.120, but fifteen minutes after arriving at the hospital, he suffered cardiac arrest. N.T. 2.111. He died just after midnight. N.T. 2.62. At trial Dr. Stuart Friedman, the emergency room physician who treated Mr. Leichter, testified that the stressful situation that Mr. Leichter had suffered could have caused the cardiac arrest. N.T. 2.122–2.123. Dr. Robert Segal, Assistant Medical Examiner, testified: "Cause of death is arteriosclerotic cardiovascular disease aggravated by the robbery and kidnapping. The manner of death is homicide." N.T. 3.23.

Defense counsel objected to admission of the tape recording and the transcript of the recording, Officer Delaney's testimony, and Nurse Reese's testimony. The trial court, however, overruled the objections and admitted the evidence under the "res gestae exception" to the hearsay rule.

–1–

To speak accurately, there is no "res gestae exception" to the hearsay rule; the exception so-called is in fact a catch-

all exception that embraces several distinct, though sometimes overlapping, exceptions. As this case illustrates, analysis is aided if we ask whether the evidence in question is within one of the distinct exceptions, and forgo altogether any reference to "res gestae," which has been rightly condemned as "a Latin phrase to serve as a substitute for reasoning," Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229, 229 (1922); as an expression that gives lawyers and judges "relief at a pinch," Thayer, *Bedingfield's Case,* 15 Amer.L. Rev. 1, 10 (1881); and as "a password for the admission of otherwise inadmissible evidence," McCormick on Evidence 836 (Cleary ed. 1984).

In the hope, no doubt, of improving analysis, the Supreme Court in *Commonwealth v. Pronkoskie,* 477 Pa. 132, 383 A.2d 858 (1978), with citation to Morgan, *supra,* 477 Pa. at 137 n. 3, 383 A.2d at 860 n. 3, stated:

As we have recognized, *"res gestae"* is actually a generic term encompassing four discrete exceptions to the hearsay rule: (1) declarations as to present bodily conditions; (2) declarations of present mental states and emotions; (3) excited utterances; and (4) declarations of present sense impressions.

*Id.,* 477 Pa. at 136–37, 383 A.2d at 860 (footnote omitted). Despite this statement, references to the "res gestae exception" continue to occur, sometimes without explaining which of the distinct exceptions in question is meant, other times as though the "res gestae exception" referred only to the excited utterance exception. *See Commonwealth v. Coleman,* 458 Pa. 112, 116, 326 A.2d 387, 389 (1974) ("The practice in many courts, including those of this Commonwealth, has been to refer to the particular exception by the generic designation."); *Commonwealth v. Farquharson,* 467 Pa. 50, 67, 354 A.2d 545, 554 (1976) ("the traditional concept of a res gestae statement ... is ... a spontaneous utterance emanating from an overpowering emotional and shocking experience sufficient to exclude the possibility that the statements were the product of premeditation or

design."). Here, the trial judge, while properly citing and stating *Pronkoskie,* nevertheless treated "the res gestae rule" as applying only to excited utterances. Slip op. of tr. ct. at 14–16.

–2–

█ It will be helpful, before considering which of the four distinct exceptions identified in *Pronkoskie* may be applicable to the testimony in this case, to define each of the exceptions.

–a–

To come within the excited utterance exception to the hearsay rule, a statement must be:

"... a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties." *Allen v. Mack,* 345 Pa. 407, 410, 28 A.2d 783, 784 (1942).

*Commonwealth v. Pronkoskie, supra* 477 Pa. at 137–38, 383 A.2d at 860.

The justification for the excited utterance exception is that "a spontaneous declaration of an individual who has recently suffered an overpowering and shocking experience is likely to be truthful." *Commonwealth v. Cheeks,* 423 Pa. 67, 70, 223 A.2d 291, 293 (1966). Whether an utterance fits within the exception is to be determined on the facts of the particular case. As was said in *Commonwealth v. Cooley,* 465 Pa. 35, 348 A.2d 103 (1975):

The spontaneity of such statements is, of course, dependent on the peculiar facts and circumstances of each case. We have held that time lapses equal to and greater than that present here do not bar the admission of a statement

where the spontaneity born of excitement is otherwise satisfactorily shown to exist. *Commonwealth v. Banks,* 454 Pa. 401, 311 A.2d 576 (1973) (15–20 minutes); *Commonwealth v. Cheeks,* 423 Pa. 67, 223 A.2d 291 (1966) (45 minutes). We have also held repeatedly that the mere fact that a statement is made in response to a question does not prevent its admission as a res gestae statement. *Commonwealth v. Banks, supra; Commonwealth v. Edwards,* 431 Pa. 44, 244 A.2d 683 (1968); *Commonwealth v. Stokes,* 409 Pa. 268, 186 A.2d 5 (1962); *Commonwealth v. Rumage,* 359 Pa. 483, 59 A.2d 65 (1948); *Commonwealth v. Harris,* 351 Pa. 325, 41 A.2d 688 (1945). It is true, of course, that in some instances the time lapse may be so long or the question and answer exchange so unhurried and reflective as to require a finding of nonspontaneity,....

*Id.,* 465 Pa. at 41–42, 348 A.2d at 107.

In considering the facts of the particular case, the courts have considered: (1) whether the declarant in fact witnessed the startling event, *Commonwealth v. Pronkoskie, supra* (child declarant did not see "Daddy sho[o]t Mommy"); (2) the time that elapsed between the startling event and the declaration, *see Commonwealth v. Robinson,* 273 Pa.Super. 337, 417 A.2d 677 (1979) (statement not admissible when, *inter alia,* time lapse could not be determined); (3) whether the statement was in narrative form, *see Commonwealth v. Green,* 487 Pa. 322, 328, 409 A.2d 371, 374 (1979) (statement given in form of narration and as explanation of past events not admissible); *Commonwealth v. Little,* 469 Pa. 83, 88, 364 A.2d 915, 917 (1976) (responses to questions six hours after incident not admissible); (4) whether the declarant spoke to others before making the statement, or had the opportunity to do so, *Commonwealth v. Green, supra* (victim reported incident to others—subsequent statement not admissible); *Commonwealth v. Little, supra* (victim had opportunity to speak to others—statement not admissible); *Cody v. S.K.F. Industries, Inc.,* 447 Pa. 558, 565, 291 A.2d 772, 775 (1972) ("distinct break in the continuity during

which time the decedent had seen a number of people, to whom he did not mention anything about the accident" made statement inadmissible). It is important to note that none of these factors, except the requirement that the declarant have witnessed the startling event, is in itself dispositive. Rather, the factors are to be considered in all the surrounding circumstances to determine whether a statement is an excited utterance.

–b–

■ Cases involving the present sense impression exception to the hearsay rule are infrequent. This exception requires that the declarant see the event and make an observation about it to another person also present at the scene; the observation must be made at the time of the event, or so shortly thereafter that it is unlikely that the declarant had the opportunity to form the purpose of mis-stating his observation. McCormick, *supra* at 860–62. Commentators have generally characterized the occurrence giving rise to the declaration as an *un*exciting event. *See* Thayer, *supra* at 83; Morgan, Res Gestae, 12 Wash.L.Rev. 91, 98; *but see* Wigmore Evidence § 1747 (Chadbourn rev. 1976). Reliability is considered assured by the contemporaneousness of the statement, and by the fact that the observation is made to another person. McCormick, *supra.* As McCormick has observed, in many cases the occurrence has in fact been an exciting event. *See* McCormick, *supra* at 861 n. 10. *And see Commonwealth v. Coleman,* 458 Pa. 112, 326 A.2d 387 (1974), discussed *infra.*

The leading case involving the present sense impression exception is *Houston Oxygen Co., Inc. v. Davis,* 139 Tex. 1, 161 S.W.2d 474 (1942). There, a passenger in a car being passed by another car at a high rate of speed stated: "We['ll] find them somewhere on the road wrecked if they keep that rate of speed up." *Id.* at 5, 161 S.W.2d at 476. In *Commonwealth v. Coleman, supra,* two Justices adopted the present sense impression exception to the hearsay rule. Relying on *Houston Oxygen,* JONES, C.J., joined by O'BRIEN, J., with EAGEN and MANDERINO, JJ.,

concurring in the result, held that statements by the victim of a murder, made to the victim's mother over the telephone, that her boyfriend would not leave, that he said he would hang up the telephone, and that he was going to kill her, could be testified to by the mother as her daughter's present sense impressions. The mother further testified that during the call she heard shouting in the background. POMEROY, J., joined by ROBERTS and NIX, JJ., concluded that the mother's testimony was admissible—but under the excited utterance exception, not the present sense impression.

In *Commonwealth v. Farquharson, supra,* the Supreme Court, relying on this court's decision in *Commonwealth v. Craven,* 138 Pa.Super. 436, 11 A.2d 191 (1940),[1] acknowledged that the present sense impression exception to the hearsay rule is recognized in Pennsylvania, but concluded that the statements offered—testimony as to an argument between the victim and his assailant and a subsequent conversation with the victim—did not show an "absence of retrospective mental action ... sufficiently clear to justify the admission of the evidence." 467 Pa. at 68, 354 A.2d at 554. *See Reichman v. Wallach,* 306 Pa.Super. 177, 452 A.2d 501 (1982) (patient's testimony that anesthesiologist "yell[ed] into a telephone: 'I have put five messages to Dr. Wallach's [the surgeon's] office. None of them returned. I

1. In *Craven,* the declarants were prisoners in Holmesburg Prison in Philadelphia. They had been sent to the "Klondike," an area where as punishment prisoners received reduced rations and were subjected to steam heat. Twenty-five prisoners were thus tortured over one weekend, and four of them died. The prisoners described the cells in the "Klondike" as "like ovens" with "the doors and walls ... so hot that it was impossible to touch them without receiving burns." The warden was convicted of involuntary manslaughter, and on appeal it was argued that testimony of "complaints of the prisoners and of requests to the guards that [the warden] come to Klondike," 138 Pa.Super. at 442, 11 A.2d at 194, should not have been admitted. We disagreed, stating: "This evidence had a bearing on the inmates' sufferings and their efforts to obtain relief during this period. These contemporaneous statements were voluntarily and spontaneously made at the time of the occurrence and under circumstances which dispel the idea of a design or motive for misrepresentation or invention, and were admissible as part of the res gestae." *Id.*

have Mrs. Reichman in critical condition' " held not admissible as present sense impression).[2]

–c–

We are aware of no Pennsylvania appellate case that has expressly cited the exception to the hearsay rule for statements of present physical condition to hold a statement admissible. In two cases, however, statements describing present physical conditions were considered under the rubric of the "res gestae."

In *Thompson v. City of Philadelphia*, 222 Pa.Super. 417, 294 A.2d 826 (1972), we held admissible as a "res gestae" statement the statement of an accident victim: "I was crossing from the West to the East side of 21st Street. I saw the truck. I saw it back up. I couldn't get out of the way. It hit me. My left hip hurts." *Id.*, 222 Pa.Superior Ct. at 419, 294 A.2d 827–28. The statement was made to a police officer while the victim was in the x-ray room of the hospital one hour after the accident. We treated it as an excited utterance: "If the decedent was so much in pain that his attention was focused on his pain and not on the circumstances surrounding the accident, *this statement as to those circumstances* cannot be said to be 'shrewd and self-calculating.' " *Id.*, 222 Pa.Superior Ct. at 420–21, 294 A.2d at 828 (quoting *Campbell v. Gladden*, 383 Pa. 144, 147, 118 A.2d 133, 135 (1955)) (emphasis added).

*Cody v. S.K.F. Industries, Inc., supra,* is another case which may appear to involve the exception for statements of present physical condition. Closer examination reveals, however, that, as we did in *Thompson,* the Supreme Court considered the statements within the exception for excited utterances. There, the plaintiff's decedent had been "struck on the head and knocked to the ground by an overhead garage door" while at work. *Id.* 447 Pa. at 561, 291 A.2d at 773. He left work early and was driven home by a fellow employee. Upon arriving home he complained to his wife of a severe headache and explained what had

---

**2.** It was also held that Mrs. Reichman's testimony was not admissible as a spontaneous utterance.

happened at work. Several days later he stated to his physician that he had been struck on the head by the garage door. Without discussing whether the declarant's complaint of a severe headache to his wife and his statement to the physician were statements of present bodily condition, the Court held that the "statements concerning the accident [were] not admissible as res gestae." *Id.*, 447 Pa. at 563, 291 A.2d 774. The Court went on to hold that the statements to the wife should not have been admitted because they were not "spontaneous utterances springing out of the act.... [but] were the result of consideration, and must be viewed as a narration or explanation of the past event." *Id.*, 447 Pa. at 565, 291 A.2d at 775. However, the Court concluded that while the statements to the physician were not admissible as "res gestae," they nevertheless were admissible. The Court noted that "[t]he law in Pennsylvania ... has been that statements to a doctor were admissible insofar as they were necessary and proper for diagnosis and treatment and referred to symptoms, feelings and conditions." *Id.*, 447 Pa. at 566, 291 A.2d at 776. "Upon re-examining this rule," *id.*, the Court concluded that the statements to the physician on the cause of the accident should be admitted. Quoting McCormick, the Court held that "statements as to external cause when relevant to treatment and made to a doctor employed for that purpose are [*i.e.*, should be admitted as] evidence of the fact stated ... particularly in actions for death where there were no eyewitnesses other than the victim...." *Id.*

The law has continued to develop the concept of the exception for statements of present bodily condition. Perhaps the most influential formulation of the exception is in the Federal Rules of Evidence, Rule 803(4), which makes admissible, "even though the declarant is available as a witness," "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past and present symptoms, pains, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

*And see United States v. Iron Shell,* 633 F.2d 77 (8th Cir.1980), *cert. denied* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (collecting cases and discussing "expansive approach" of F.R.Evid. 803(4), in particular whether statements may concern past symptoms and causes of injury). *See also* McCormick, *supra* at 842 (noting "dubious propriety" of various restrictions placed on admissibility of statements of present bodily condition, and approving F.R. Evid. 803(4)).

**-d-**

Finally, there is the exception for statements of present mental condition. Here it is important to distinguish between a case in which the declarant's state of mind is itself relevant, and a case in which the declarant's state of mind is relevant not in itself but as the basis of inferring that because his state of mind was such—and—such, the declarant took some future action. *See, generally,* McCormick, *supra* at 842 *et seq. And see* F.R.Evid. 803(3). As an example of the first sort of case: if it is relevant whether the declarant loved his wife, whether he did may be proved by a statement of how he regarded her. The leading example of the second sort of case is *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892), in which the statement, "I expect to leave Wichita with Mr. Hillmon", was admitted on the reasoning that it showed the declarant's intent to leave, and that his "intention of going, and of going with Hillmon, ... made it more probable both that he did go and that he went with Hillmon, than if there had been no proof of such intention." *Id.* at 296, 12 S.Ct. at 913.

These principles have been recognized in our law, although the cases are sparse. A careful discussion appears in *Ickes v. Ickes,* 237 Pa. 582, 85 A. 885 (1912). There the action was by a wife against her husband's father to recover damages for alienation of her husband's affections, resulting in his desertion. One of the issues was whether the defendant father-in-law could show by a witness that eight or ten days before the husband's departure, the

witness had heard the husband accuse his wife of infidelity and her confession that she was pregnant by another man, and that the day before the husband's departure, he had said that he was about to leave because he was not father of the child. The trial judge excluded this testimony on the objection that it was "[t]oo remote from the time of leaving to be a part of res gestae." *Id.*, 237 Pa. at 590, 85 A. at 887. The Supreme Court held that this was reversible error. After noting the distinction between "contemporaneous spontaneous exclamations growing out of and explanatory of an event" and "declarations relied upon solely to show an existing state of mind", *id.* at 591, 85 A. at 887, the Court held that when evidence of

> declarations indicating the state of mind at the time of their utterance … is produced, sufficient to show a then present intention, or state of mind, it may be assumed to have continued and formed the motive which controlled the doing of a subsequent act following closely thereafter, if under all the surrounding circumstances one would actually associate the two together; and it is for the jury to draw the conclusion.

*Id.*, 237 Pa. at 591, 85 A. at 888.

*And see Smith v. Smith*, 364 Pa. 1, 9, 70 A.2d 630, 633 (1950) (declaration of intent to stay in Florida held admissible on issue of domicile; *Ickes v. Ickes, supra,* cited).

–3–

■ We are now in a position to consider the admissibility of the evidence of Mr. Leichter's statements to the police dispatcher, Officer Delaney, and Nurse Reese. Plainly, all of these statements were hearsay, for they were made out of court, and were offered for their truth—that Mr. Leichter was robbed and kidnapped at gun point, and that as a result he experienced physical distress, which lead to his death. We must therefore ask whether the evidence falls within any of the four exceptions to the hearsay rule identified in *Commonwealth v. Pronkoskie, supra.*

**-a-**

■■■ We may start with the present sense impression, or *Houston Oxygen,* exception, for it is readily apparent that this exception is not available. In the first place, in none of his statements did Mr. Leichter describe an event that he was then observing. It is true that in his statements over the telephone to the police dispatcher he described events— his abduction, robbery, and abandonment in the park—that had very recently occurred, and arguably, might be found to have occurred so soon after his description of them as to be "present" enough to be within the present sense exception; especially might this be said of his abandonment in the park. Even so, however, the exception is not available, for Mr. Leichter did not make his descriptive statements in the presence of another person who also was at the scene. As we have seen in discussing *Houston Oxygen,* the requirement that there be such a person is critical to providing the assurance of reliability needed to warrant admission of a statement as within the present sense impression. We are mindful of the fact that the opinion of the Chief Justice in *Commonwealth v. Coleman, supra,* may be read as not requiring the presence at the scene of someone in addition to the declarant; thus, the mother was not at her daughter's apartment and therefore was unable to observe the events that her daughter was describing. However, it will be recalled that the mother *was* able to *hear* shouting in the background, so that there was at least some corroboration of the accuracy of her daughter's description of what was happening.

**-b-**

■■■ At least one of Mr. Leichter's statements was admissible as within the exception for statements of present mental condition, specifically, his statement to Nurse Reese, "I'm so frightened." This evidence of mental condition was relevant to the determination of the cause of Mr. Leichter's death. It is also arguable that Mr. Leichter's statements to the police dispatcher were statements of present mental

condition. At least, the responses of the dispatcher indicate that he understood Mr. Leichter as saying that he was frightened and worried. (*See, e.g.*, Mr. Leichter's statements, "I'm having a little trouble breathing," and "The first time I ever had this happen", and the dispatcher's responses, "I know it's tough to relax;" "But the worst is over . . .; "I know it's a frightening experience."). Nevertheless, Mr. Leichter did not directly state his mental condition, as he did to Nurse Reese, and it is better to regard his statements to the dispatcher as not hearsay at all but rather as circumstantial evidence, that is, as evidence from which his mental condition could be inferred. In this regard, we note that the principle illustrated by *Mutual Life v. Hillmon, supra,* is not implicated here, for there was no issue whether, because he was frightened, Mr. Leichter took some action in the future.

**—c—**

Many, and as we shall see, arguably all, of Mr. Leichter's statements were admissible as excited utterances.

■ Appellant concedes that "there can be no doubt that Decedent's having been kidnapped and robbed by three men at shotgun point was an event sufficiently startling to satisfy the first element" of the excited utterance exception, that is, that the declarant experienced a startling event. Brief for Appellant at 9 (citing *Commonwealth v. Cooley, supra*). He argues, however, that none of Mr. Leichter's statements was a spontaneous reaction to that startling event. With regard to Mr. Leichter's statements to the police dispatcher appellant points out that in response to a question of the dispatcher, Mr. Leichter stated that he did not think he needed to go to a hospital. N.T. 2.91. Appellant further notes that in his call to the dispatcher Mr. Leichter expressed concern about his wife, N.T. 2.32, and that when he arrived at the hospital with Officer Delaney, he declined a wheelchair, N.T. 2.40. Appellant maintains that these circumstances suggest that Mr. Leichter's statements to the dispatcher and Officer Delaney were "so

unhurried and reflective as to require a finding of non-spontaneity." Brief for Appellant at 9 (*quoting Commonwealth v. Little, supra*). Appellant also argues that since Mr. Leichter's statements to Nurse Reese were preceded by his statements to the police dispatcher and Officer Delaney, they lost the required spontaneity.

■ We are not persuaded by this argument. In our view, the record demonstrates that Mr. Leichter's statements, even though made some time afterwards, were nevertheless a spontaneous reaction to a startling event. We may explain this conclusion by examination of three cases: *Commonwealth v. Cheeks, supra; Commonwealth v. Little, supra;* and *Commonwealth v. Green, supra.*

In *Cheeks,* after the victim had been stabbed,

slow of gait as the result of a stroke, [he] walked directly to his sister's home about five blocks distant. When he arrived his appearance was described "like he had been beat" and "crying." Very shortly after his arrival, he told his sister that four unknown boys had assaulted and robbed him, and that one of the boys was wearing a patch over his eye.

423 Pa. at 69, 223 A.2d at 292 (footnote omitted). After the victim had changed his clothes, he told his sister that "those boys did cut me." *Id.,* 423 Pa. at 70, 223 A.2d at 293. The entire series of events from the incident to the victim's statements to his sister lasted from forty-five minutes to an hour. In holding the hearsay statements of the victim's sister admissible, the Court stated that "[t]he conclusion is inevitable that the statements were spontaneously uttered, were directly related to the event and were not the result of reflection or design." *Id.,* 423 Pa. at 71, 223 A.2d at 293.

The facts of *Little,* on which appellant principally relies, may be usefully compared with the facts of *Cheeks.* In *Little,* the victim of a gunshot wound was found semi-conscious at about 3:00 a.m. One hour later, a police officer unsuccessfully attempted to interview him. The police offi-

cer returned at 9:15 a.m., and after a discussion of about five minutes, the victim identified appellant as his assailant. In holding the statement of identification inadmissible, the Court noted the six-hour delay between the incident and the statement, that the victim had been removed from the scene of the crime, that the victim may have had discussions with others during the six-hour delay, and that the statements were "anything but spontaneous." 469 Pa. at 88, 364 A.2d at 917.

*Green* is like *Little.* There, the Court found that a statement given to the police following a rape lacked the requisite spontaneity because it was given in the form of narration, three and one-half hours after the incident, and after the victim had reported the incident both to her mother and to another investigating officer. 487 Pa. at 327–28, 409 A.2d at 374. The Court stated: "These circumstances negate the required spontaneity and prevent the statement's admission as an excited utterance." *Id.,* 487 Pa. at 328, 409 A.2d at 374.

Mr. Leichter's statements to the dispatcher and the circumstances surrounding it are strikingly similar to the statement of the victim in *Commonwealth v. Cheeks, supra,* and the circumstances there. This is so despite the fact that some of Mr. Leichter's statements were in response to questions, that he showed concern for his wife, and that he stated that he didn't think that he needed to go to the hospital. It is clear that Mr. Leichter was in grave distress and that his statements were not the product of reflection or design. He had just been abandoned in the park by his assailants. Although, as in *Cheeks,* he had to travel some distance to reach the telephone booth, still, his call to the police was placed only some fifteen to seventeen minutes after the incident. When he reached the police dispatcher, Mr. Leichter's first words described the incident, and his ensuing statements to the dispatcher, and the dispatcher's responses, leave no doubt that during the entire telephone call Mr. Leichter remained under the stress of the incident.

Mr. Leichter's statements to Officer Delaney and Nurse Reese present somewhat different questions, for they implicate some of the concerns raised in *Commonwealth v. Little, supra,* and *Commonwealth v. Green, supra.* In *Little,* as we have indicated, the Court did not know from the record whether, in the six hours that intervened between the incident and the victim's statement to the police, the victim had discussed the incident with others, and in *Green,* there was evidence of record that in the three and one-half hour time lapse, the victim had discussed the incident with two other persons before giving the statement in question. Thus in both cases the lapse of time, the narrative form of the statements, and the fact that the victim had or may have had the opportunity to reflect upon the incident and to discuss it with others, in combination compelled the conclusion that the statements were not spontaneous. Here, the circumstances surrounding the statements to Officer Delaney and Nurse Reese were far different. The statements were made within one-half hour to forty-five minutes of the incident. They were made under the continuing and uninterrupted stress arising from the incident. They repeated, without alteration, the statement already made to the dispatcher. And Mr. Leichter had no opportunity to discuss the incident with anyone else, or to reflect upon it. Thus, despite the fact that Mr. Leichter's statements to Officer Delaney and Nurse Reese appear from the record to have been in narrative form, and were preceded by at least one other account of the incident, we are satisfied that they were free of reflection and thus admissible as excited utterances.

–d–

▬ Finally, we also conclude that Mr. Leichter's statements to Nurse Reese were admissible as statements of present physical condition, quite independently of their admissibility as excited utterances. The statements described Mr. Leichter's physical condition; they were made so that his condition could be diagnosed and treated; and while they described the cause of his condition,—his abduction

and robbery—this description was immediately relevant to his diagnosis and treatment, which is to say, in giving it, he must have thought of himself as giving information that would enable the hospital to help him. The statements therefore carried a "strong assurance of reliability", McCormick, *supra* at 839, and were properly admitted.

We recognize that this conclusion may seem to go beyond the holding in *Cody v. S.K.F. Industries, Inc.*, *supra*, but we are satisfied that it does not. It is true that in *Cody* the statements were to a doctor, rather than to a nurse. However, as we read *Cody*, the important fact there was that the statements were to *medical personnel*, not that they were to a doctor rather than to a nurse. The Court's concern was with the probable reliability of the statements, and as to that, it would make little if any sense to distinguish between a doctor and a nurse; a patient in distress is unlikely to lie to either. As we have mentioned, under the Federal Rules of Evidence, F.R.Evid. 803(4), and in McCormick's view, it is immaterial whether the statements were made to a doctor or nurse; "[a statement] made to a hospital attendant, ambulance driver, or member of the family may qualify." McCormick, *supra* at 840 (footnote omitted). If the law in Pennsylvania has moved this far, then Mr. Leichter's statements to Officer Delaney, on the way to the hospital, regarding his being a heart patient and needing oxygen, would also be admissible as statements of present physical condition. However, we need not now decide this point.[3]

Affirmed.

3. In its brief the Commonwealth argues that all of Mr. Leichter's statements were also independently admissible as dying declarations. Brief for Appellee at 7 n. 4. To qualify as a dying declaration, the statement must be made "by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death." F.R.Evid. 804(b)(3). *See Commonwealth v. Miller*, 490 Pa. 457, 417 A.2d 128 (1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981); *Commonwealth v. Farrior*, 312 Pa.Super. 408, 458 A.2d 1356 (1983). Here the record does not show that Mr. Leichter believed his death imminent. Indeed, he told the dispatcher, "I don't think I have to go to the hospital." It is

true that when he did go to the hospital, he told Nurse Reese that he
was having trouble breathing and was frightened, and he may in fact
have been afraid of dying. The more natural inference to be drawn
from this statement, however, is that he was speaking to Nurse Reese,
not conscious of uttering his last words, but to seek her medical help.