543 A.2d 1169

**COMMONWEALTH of Pennsylvania**

**v.**

**Ford HOWARD, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 9, 1987.

Filed June 6, 1988.

46

Bruce A. Franzel, Philadelphia, for appellant.

Donna G. Zucker, Assistant District Attorney, Philadelphia, for Com.

Before WIEAND, KELLY and HESTER, JJ.

HESTER, Judge:

Following a jury trial held December 6–28, 1985, Ford Howard, appellant, was convicted of first degree murder, criminal conspiracy and possession of an instrument of crime. At the penalty hearing held December 31, 1985, the jury imposed a life sentence on the murder conviction. At the formal sentencing on September 3, 1986, the trial court denied post-trial motions and imposed the judgment of sentence of life imprisonment for murder, ten to twenty years imprisonment for conspiracy and two and one-half to five years imprisonment for possession, all sentences to be served consecutively. On reconsideration, the sentencing court reduced the conspiracy sentence to five to ten years and suspended the possession sentence. This appeal followed. Appellant raises seven allegations of trial error, all of which we reject. We affirm.

Five men conspired in the murder of James "Muscles" Reynolds, who died in the early morning hours of September 1, 1983, of seven gunshot wounds, three to the head and four to the body. The five men involved in the murder include: Craig Murphy (who was separately tried and convicted of first degree murder), appellant, Rodney Wells, Esau Burroughs and Morris Willis. The latter four were tried together subsequent to Murphy's trial. The murder was motivated by the victim's drug dealings with Murphy, who was characterized as the principal in the shooting. Murphy, appellant and Wells actually shot the victim, and Burroughs was involved in planning the murder, as was Willis, who arranged to have the victim meet his executioners in a deserted playground in the early morning of September 1, 1983.

Commonwealth witness Keith Johnson testified that at approximately 10:30 p.m. on August 31, 1983, he overheard Murphy talking with appellant, Burroughs and Wells in the Motorcycle Club in Philadelphia. The four were plotting the manner in which they were going to murder a man referred to as Muscles. Murphy and appellant displayed their guns to Wells and Burroughs. Johnson heard appel-

lant say "I'm going to kill the [expletive]" and "[I'm] not going to be playing." N.T., 12/11/85 vol. 2, at 6–8. Murphy, appellant and Wells then departed, and when Johnson asked Burroughs if the three actually intended to shoot someone, the latter answered affirmatively. Murphy, appellant and Wells returned to the club at 2:00 a.m., displaying their guns. Johnson overheard appellant say to Burroughs that he had shot the victim in the head. All four left after learning that police were investigating the crime.

Commonwealth witness Bernard Williams testified that he had gone to the Motorcycle Club with Murphy early in the evening of the murder and had left that club to go to a different club across the street. Williams was leaving the second club just as Murphy, appellant and Wells were leaving the Motorcycle Club. Murphy told Williams to accompany the three men, and Williams complied. During the car ride, Williams heard Murphy discussing drug matters which he had "to take care of" with Muscles and appellant. N.T., 12/16/85, at 223–225. The four men went to the vicinity of the playground where the shooting occurred. Wells and appellant exited the car, which Murphy then parked. Murphy left Williams in the car, and Williams heard gunshots several minutes later. Soon afterward, Murphy returned to the car, informing Williams that he had "taken care of business." N.T., 12/17/85 vol. 1, at 44, 46. Williams testified that he was never informed of the murder plot.

The victim's wife, Sonia Mackie, testified that at around midnight on August 31, 1983, she received a call from co-defendant Willis, who informed her that she and Muscles were to meet him in the playground where the shooting later occurred in order to pick up drug money. Mackie decided to stay home while Muscles left for his rendezvous with death. Willis subsequently telephoned Mackie with the news of Muscle's death. Sometime later, appellant admitted to Mackie that he was present at the murder, showing her the gun that he had used and admitting that Murphy had ordered him to kill her.

■ Appellant first alleges that he was improperly denied access to written reports made by two police witnesses as well as to grand jury testimony of several other witnesses. Two police witnesses, along with several others, testified solely to establish a relationship among the victim and the five men involved in the murder. Appellant conceded that the police witnesses' written reports to which he was denied access related to the events surrounding the arrest of Murphy and Wells on September 5, 1983, for a different murder. *See* N.T., 12/11/85 vol. 1, at 52–57; N.T., 12/13/85, at 25–31. Thus, it is clear that the reports did not contain information either relevant to this murder that would be beneficial to appellant or upon which he could have based cross-examination. Furthermore, the two officers' testimony was cumulative to that of several other witnesses as well as tangential to the evidence upon which appellant's conviction rests. Accordingly, if error occurred, we find that such error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *cf. Commonwealth v. Hamm,* 474 Pa. 487, 378 A.2d 1219 (1977).

■ Appellant also complains that the trial court erred in giving him edited portions of testimony of several of the Commonwealth witnesses who testified before an investigating grand jury. The trial court reviewed the grand jury testimony of those witnesses, omitted the portions relating to other investigations and gave appellant the portions relating to this murder. Although appellant speculates that the omitted portions of testimony relating to other investigations may have been helpful in his cross-examination of the witnesses, no trial error occurred. Pa.R.Crim.P. 263(b)(2); *Commonwealth v. Kelly,* 245 Pa.Super. 351, 369 A.2d 438 (1976), *aff'd,* 484 Pa. 527, 399 A.2d 1061, *appeal dismissed, Kelly v. Pennsylvania,* 444 U.S. 947, 100 S.Ct. 417, 62 L.Ed.2d 317 (1979).

■ Appellant's next allegation is that the trial court incorrectly failed to give an accomplice charge with respect to both Keith Johnson and Bernard Williams. He argues

that Williams and Johnson were accomplices in the murder and testified to avoid criminal liability. An accomplice charge with respect to a witness is warranted when the evidence at trial either requires or permits the inference that the witness may have been a participant in the crime. *Commonwealth v. Smith*, 343 Pa.Super. 435, 495 A.2d 543 (1985). In this case, there simply was no evidence to link Williams and Johnson to the crimes. Both unequivocally denied any involvement in planning or perpetrating the murder, and no other witnesses tied them to the crime. Presence at a crime scene and association with criminals are insufficient bases upon which criminal culpability may be predicated. Presence and association are the only pieces of evidence presented by appellant in support of his position that they were accomplices. We conclude that the trial court correctly determined that Williams and Johnson were not accomplices to the murder, and accordingly, the trial court did not commit error in refusing to so charge the jury. *Commonwealth v. Smith, id.; Commonwealth v. Hines*, 341 Pa.Super. 456, 491 A.2d 907 (1985); *Commonwealth v. Richey*, 249 Pa.Super. 365, 378 A.2d 338 (1977).

Appellant's third argument is that he was denied his constitutional right to confront witnesses when the trial court failed to delete certain hearsay statements contained in a statement made by co-defendant Willis to the police. Detective Joseph Brignola testified that the day after the shooting, Willis described what he had observed the evening of the murder. Willis stated as follows. Willis called Muscles and asked to meet him at Willis' house, which is near the playground where Muscles was murdered. Willis met the victim at the designated rendezvous point; the two men injected heroin together and walked toward the playground. Muscles went into the playground alone after Willis was called back home. Once Willis arrived home, he heard shots and left the house again, yelling for a woman named Francine, who was with a woman named Toby. Willis inquired concerning the shots, and Toby answered

that she had seen "three guys in the park" and that "Muscles didn't come out." N.T., 12/10/25, at 113.

Appellant objects to the quoted language as inadmissible hearsay and requests a new trial on grounds that he was denied the opportunity to confront the hearsay declarant. We find that the declarations were admissible under the present sense impression exception to the hearsay rule and that no trial error occurred. *Commonwealth v. Blackwell,* 343 Pa.Super. 201, 494 A.2d 426 (1985).

■ Appellant's fourth allegation of trial error, that he was restricted in his cross-examination of the victim's wife, is clearly meritless. Appellant tried to establish that Mackie testified solely to gain leniency in a pending drug proceeding that had been instituted against her. He cross-examined her on this issue extensively. N.T., 12/16/85, at 17–23, 44, 75. She denied that her testimony about her husband's murder was motivated by promises or threats from the district attorney's office about her drug case. Furthermore, her attorney's testimony establishes that the district attorney's office made no promises or arrangements. N.T., 12/19/85, at 61–67, 72–74, 80–87. That testimony also reveals that any expectations in that regard were not based on statements by any district attorney, but were based on Mackie's attorney's *hopes* that the possibility of leniency existed. Thus, appellant's efforts to cross-examine Mackie on this issue were not curtailed; there was no independent evidence to establish that leniency was promised, and no trial error occurred. *Cf. Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626 (1986).

■ Appellant also complains that a statement made by co-defendant Wells to a man named Charles Harris implicated him in the murder and was introduced in violation of the rule set forth in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Charles Harris testified that he had loaned his brown Toyota to Craig Murphy at the end of the summer of 1983. When Murphy returned the car to Harris at the beginning of September, 1983, Harris discovered blood on the right hand passenger's seat as well

as a half-filled box of bullets inside the glove compartment. After the police informed Harris that his car had been used in a homicide, Harris ran into Wells at the Philadelphia Detention Center. At trial, Harris related the conversation that he had had with Wells. During the conversation, Harris accused "them" of using his car for a murder, and Wells reassured Harris that "they" had not used Harris' car, that "they" had used Murphy's car and that police were incorrect. N.T., 12/17/85 vol. 1, 188–190; N.T., 12/17/85 vol. 2, at 207.

Appellant posits that it is clear that Wells' use of the word "they" implicated him specifically in the murder and was introduced at trial in violation of *Bruton*. We disagree. *Commonwealth v. Sanford*, 323 Pa.Super. 436, 470 A.2d 998 (1984) (co-defendant's redacted confession containing "we" and "us," instead of specific names, admissible under *Bruton*); *Commonwealth v. McQuaid*, 273 Pa.Super. 600, 417 A.2d 1210 (1980) (introduction of co-defendant's confession containing plural pronouns in reference to other participants in crime was not a violation of *Bruton*); *see also Commonwealth v. Guess*, 266 Pa.Super. 359, 404 A.2d 1330 (1979).

 Appellant also requests a new trial on the basis of two instances of alleged prosecutorial misconduct, described as follows. First, when appellant's counsel asked if he could handle and examine three bullets from the victim's body, the prosecutor objected, stating that he did not "trust" counsel and asking that someone from ballistics handle the bullets. N.T., 12/9/85, at 126. Second, during a sidebar proceeding, the prosecutor called appellant's counsel a "sucker." N.T., 12/19/85, at 56. We disagree with appellant's contention that these remarks require a new trial, which is warranted only if the unavoidable effect of the prosecution's remarks is to prejudice the jurors, forming in their minds bias and hostility toward the defendant to such an extent that they could not weigh the evidence objectively and render a true verdict. *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986). As to the

first remark, the prosecution was expressing concern over the handling of vital, sensitive Commonwealth evidence, and we do not view his comments as rising to the requisite level of prejudice such as to require a new trial. As to the second remark, appellant failed to establish that the jury heard the remark. The record clearly indicates that the remark was made beyond the hearing of the jury, which cannot be prejudiced by something it did not hear. Appellant failed to ask the jurors if they heard the remark. A new trial is not warranted on the basis of these two remarks.

Appellant also argues that the prosecutor committed reversible error: 1) during his closing statement with the comment that: "We don't need any new witnesses. We will go with what has brought us this far. And let's talk about one down and four to go," N.T., 12/27/85, at 8; and 2) when he hammered his fist on a large file box while repeating, "One down and four to go." On the side of the box facing the jury appeared the names of Craig Murphy, appellant and the three co-defendants. There was a check mark next to Craig Murphy's name. According to appellant, by allowing the jury to see this box and by the prosecutor's statements, the message to the jury was, in effect, a directive to the jury to find appellant and his co-defendants guilty just as Craig Murphy had been found guilty by another jury.

In assessing appellant's contentions, we are mindful that a prosecutor must limit his statements to the facts introduced at trial and the legitimate inferences therefrom. *Commonwealth v. Bricker*, 506 Pa. 571, 487 A.2d 346 (1985) (plurality opinion). Moreover, the Commonwealth is afforded reasonable latitude in fairly presenting its version of the case to the jury. *Commonwealth v. Upchurch*, 355 Pa.Super. 425, 513 A.2d 995 (1986). The Pennsylvania Supreme Court recently reaffirmed that we must apply the "unavoidable prejudice test" as articulated in *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975), in determining the impact of prejudice in closing arguments.

> [W]here the language of the district attorney is intemperate, uncalled for and improper, a new trial is not necessarily required. *Commonwealth v. Crittenton*, 326 Pa. 25, 31, 191 A. 358 (1937); *Commonwealth v. McHugh*, 187 Pa.Super. 568, 577, 145 A.2d 896 (1958). The language must be such that its 'unavoidable effect would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.' *Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). *See also, Commonwealth v. Meyers*, 290 Pa. 573, 139 A. 374 (1927). The effect of such remarks depends upon the atmosphere of the trial, *Commonwealth v. Dickerson*, 406 Pa. 102, 110, 176 A.2d 421 (1962); *Commonwealth v. Del Giorno*, 303 Pa. 509, 519, 154 A. 786 (1931), and the proper action to be taken is within the discretion of the trial court. *Commonwealth v. Silvis*, 445 Pa. 235, 237, 284 A.2d 740 (1971); *Commonwealth v. Simon, supra.*

*Commonwealth v. Johnson*, 516 Pa. 527, 532–34, 533 A.2d 994, 997 (1987). The *Johnson* court further advised: "Under this test, we are required to judge whether the mental bias of the jury has been so 'fixed' as to implicate the truth-finding function itself." *Id.*

First, we address the issue of the prosecutor's use of the file box. In *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460 (1984), and *Commonwealth v. Clayton*, 506 Pa. 24, 483 A.2d 1345 (1984), our supreme court condemned the prosecution's use of a file box. In *Beasley*, a box was transported into the courtroom bearing the label, "Police shooting, homicide of police officer." The trial court did not order a mistrial, finding that the label was not readable from the bench. The supreme court did not reverse, as it found no adequate basis upon which to determine the exact position of the box or the length of time the box was present. Nor could it conclude that the label could be read by any of the jurors. The court wrote:

Nevertheless, the prosecutor's blatant and inexcusable inattention in bringing the labeled box into the courtroom is to be most strongly condemned. Such conduct needlessly injected this case with an issue that, under less speculative circumstances, could be deemed to have impaired the integrity of the trial. In the present case, however, any prejudice to the defense is of such a speculative nature as not to require that a new trial be granted. *Commonwealth v. Beasley, supra*, 505 Pa. at 286, 479 A.2d at 463–64.

In *Commonwealth v. Clayton, supra*, 506 Pa. at 34 n. 1, 483 A.2d at 1350 n. 1, the supreme court reversed on other grounds, but noted:

> The Appellant has raised the issue of whether the presence of a box on the prosecutor's table marked with red lettering stating, "Willie Clayton–Murder, Robbery", was a denial of his right to a fair trial. The box contained the trial file in this matter. Although we decline to address the issue at this point, we will take this opportunity to note that the preferable practice is to avoid actions which have the potential to affect a verdict against the defendant on appeal where precautionary measures may be taken effortlessly. Our concern is engendered by the fact that this claim is not founded on an isolated incident. In *Commonwealth v. Beasley*, [505] Pa. [279], 479 A.2d 460 (1984), we condemned similar needless conduct by a prosecutor and now reiterate the concerns expressed therein.

In the instant case, we agree with the trial court that it was imprudent for the prosecutor to have utilized the file box in the manner in which it did, but we also agree with the trial court that a new trial is not warranted on this basis. Upon a defense objection to the box, the trial court observed it and noted it was difficult to see the lettering clearly, although it stated it could see the check next to Craig Murphy's name. The defense objection at trial indicated that the file box was "right in front" of the jury. Regardless of whether the jury could clearly read the

lettering on the box, it would be speculative to conclude that the box so prejudiced appellant as to warrant a new trial. The *Clayton* court declined to rest its holding on the presence of a similar box. We think it fair to note that, given our supreme court's condemnation of the use of such heavy handed tactics, the prosecution's actions have brought this case to the brink of reversal and display an irresponsibility which conflicts with the public trust placed in its office.

Nevertheless, viewing the overall atmosphere of the trial, a finding that appellant was fatally prejudiced is not appropriate. The trial was conducted over the course of many days. The jury considered great quantities of evidence, including appellant's admissions to two witnesses that he had shot the victim. The lettered box, displayed in an isolated portion of the proceedings, also presented information about which the jury had already been made aware by the *defense*. It was the defense which had told the jury that Craig Murphy had been convicted, prior to the closing argument. We, therefore, agree with the conclusion of the trial court that that the presence of the box did not so sway the passions of the jury as to have rendered them incapable of weighing the evidence and rendering a true verdict.

■■■ Regarding the prosecutor's comment about the witnesses having testified during Murphy's successful prosecution and his use of the phrase "one down and four to go," we again note that it was the *defense* that introduced evidence that Craig Murphy had been convicted of first degree murder for Muscles' death. It was also the defense that repeatedly brought to the jury's attention that these witnesses were the same people who testified at Murphy's trial. Portions of their testimony at Murphy's trial were used during cross-examination. Thus, the defense was responsible for initially informing the jury that Murphy was convicted on the basis of these witnesses' testimony.

Moreover, even if the prosecutor's remarks were intemperate, we cannot say that appellant was prejudiced. The remarks were made in the following context:

It was rather ironic ladies and gentlemen, the tack that was taken by the defense in this case. It was ironic in the sense that very seldom does the defense put before you the fact that someone has been convicted. And *they put before you that the reputed head of this group, Craig Murphy, had already been convicted of murder in the first degree.* Now, I told you initially that I would not apologize for any of my witnesses. Thousands of words have been written, been taken down, been made exhibits. You have the final word in this trial, in this drama, this drama that *the defense would have you believe,* as per their opening, *came from some fantasy world* and *they paraded before you testimony from two other proceedings and preliminary hearings and said this is fantasy.* But, *they contradict that by saying Craig Murphy has already been convicted on the testimony of the witnesses that you heard.* Does that make sense?

[Defense objection.]

*We didn't invent these witnesses.* We didn't create them. *We don't need any new witnesses. We will go with what has brought us this far. And let's talk about one down and four to go.*

N.T., 12/27/85, at 6–8 (emphasis added).

Thus, the objected-to portion of the argument merely repeated information already presented to the jury by the defense and was made in response to defense tacts. It was therefore proper. *Commonwealth v. Nenninger,* 359 Pa. Super. 444, 519 A.2d 433 (1986).

We also repeat that the isolated remarks relied upon by appellant to sustain his allegation of error came at the conclusion of a lengthy trial. They could not have so prejudiced the jury as to render them incapable of weighing the evidence objectively and returning a true verdict. Appellant is not entitled to a new trial on this basis.

■ Appellant's final argument is that Rule 1100 was violated when his trial was delayed on July 22, 1985, due to the fact that the trial court had not decided the Common-

wealth's motion to consolidate appellant's trial with that of Rodney Wells.

At the Rule 1100 hearings on October 7 and 10, 1985, the Commonwealth established that it had filed a motion to consolidate appellant's trial with that of his co-defendants. The Commonwealth was prepared to proceed to trial but for the fact the court had not yet ruled on this motion. N.T., 10/7/85, at 5.

Appellant erroneously argues that the court's unavailability to hear the motion for consolidation is irrelevant. Appellant's complaint is that the consolidation motion delayed his trial; therefore, the trial court's unavailability to hear the motion due to its heavy docket justified the grant of the Commonwealth's petition to extend. *See Commonwealth v. Kuhn*, 327 Pa.Super. 72, 475 A.2d 103 (1984) (judicial delay justifies a Rule 1100 extension). The Commonwealth had no control over when the trial court would decide the motion, and its reasonable attempts to obtain a ruling on the consolidation motion constitute due diligence. *Commonwealth v. Simkins*, 297 Pa.Super. 258, 443 A.2d 825 (1982) (delay in starting trial for court to consider suppression motion is judicial delay and extension is proper); *see also Commonwealth v. Genovese*, 493 Pa. 65, 425 A.2d 367 (1981).

Judgment of sentence affirmed.

KELLY, J., filed a concurring opinion.

WIEAND, J., filed a dissenting opinion.

KELLY, Judge, concurring:

I join in the majority opinion. I write separately to explain my reasons for concluding that the prosecution's improper statements made during its closing argument do not require a new trial.

During the course of the trial, the attorneys for the four co-defendants made liberal use of prior grand jury and trial testimony in the Craig Murphy case to develop their collective defense that: the principle Commonwealth witnesses

were nefarious characters who were lying to cover their own involvement in the murder and to curry favor with the prosecution to gain leniency on outstanding charges; the criminal investigation had uncovered insufficient evidence to link the co-defendants to the crime; and, the present case was grounded on character assassination of the co-defendants and general reliance on guilt by association.

The tenor of the defense may be accurately gathered from their closing arguments. In her closing argument, counsel for Rodney Wells set the stage as follows:

You know exactly where he was killed and you know precisely when he was killed and you know that he was in fact killed. This is not a situation where there is a question as to suicide or an accident. You also know something that is often not known to jurors at the beginning. *You know who killed him. You know that Craig Murphy killed Muscles Reynolds and another jury has already convicted Mr. Craig Murphy* and so that is not a question that you even have to spend time thinking about.

The only question for you, at the bottom is whether or not Craig Murphy had someone else with him. And if he did, who those other persons or who that person was. *But, it's clear, the killer was Craig Murphy.*

(N.T. 12/26/85 at 7). (Emphasis added). In challenging the Commonwealth's case, she repeatedly expressed her personal opinion that Commonwealth witnesses lied, despite objections by the prosecution and admonitions by the trial court to refrain from the improper expression of personal opinions. (N.T. 12/26/85 at 21–22, 27, 31–32, 42–43). She also argued:

Even the fact of seven gunshots doesn't tell you, if there were seven gunshots, who if anyone was with Craig Murphy on that night.

*The theory that makes the most sense is that it was Bernard.* Bernard is in that car. He has to admit to you that he is in that car. Why would anybody take Bernard along just for the ride and *I think that Keith Johnson*

*had a role in this too.* I think that you may decide that Keith Johnson had a role in this.

(N.T. 12/26/85 at 50). (Emphasis added).

Counsel for Esau Burroughs followed-up on her arguments as follows:

Now, I want to draw your attention to a point in this that may even upset the Commonwealth when *they decided they were going to pay Mr. Burroughs back for testifying in this case.* [Referring to Craig Murphy's trial]

\* \* \* \* \* \*

His nickname is the Devil, Okay?

Now, what does that mean? That he is from hell, [Hades]? What does that mean? I had a friend who was called Chumpy and he is about this big. I have people called Lightening who were as slow as [molasses]. I don't know what devil means in this context.

*[It's] consistent with this theory of just putting everything that you have into this to give the worst impression that you can [possibly] give about this man and maybe they will pull him right along with everything else. That is what they are trying to do and it's obvious.*

\* \* \* \* \* \*

The only person who said that he had anything to do with dope was Keith Johnson. And Keith Johnson was put here to bury him. To say anything he had to say, to bury Esau Burroughs. That's sad.

I'm arguing this case, *I entered this case with a heavy heart when I found out what they were trying to do to Esau Burroughs.*

\* \* \* \* \* \*

*The Commonwealth took almost two years to decide to arrest Esau Burroughs in this case after having Keith Johnson's statement that put Esau Burroughs in it.* So, that has to say something to you. Either they didn't

believe him or they had no other information that put
Esau Burroughs in this case.

(N.T. 12/26/85 at 69–70, 73, 75, 78). (Emphasis added).

Counsel for Morris Willis continued the themes set by
preceding co-counsel:

Conjecture and guilt by association are not the basis upon
which you arrive at your conclusion. Indeed, to base
your decision on anything other than evidence from that
witness stand, has no place in our system of justice.

\* \* \* \* \* \*

Only by [innuendo] and conjecture can you conclude that
Murphy called Willis.

Ladies and gentlemen, don't allow your intelligence to be
insulted by the Commonwealth.

\* \* \* \* \* \*

*Now, there have been several grand jury proceedings
about this case. A preliminary hearing and a trial. It
has never been proven that Murphy was ever seen with
my client that night at any time.* Bear that point in
mind.

\* \* \* \* \* \*

Moreover, *the Commonwealth has had, has presented
no more evidence here, in the month of December, of
1985, than it had on September 1st of 1983, as to Morris
Willis.*

\* \* \* \* \* \*

So ladies and gentlemen, the Commonwealth is bottoming
its case in part on a witness that even other Common-
wealth witnesses don't believe. That's incredible. Quite
incredible.

(N.T. 12/26/85 at 83, 85, 87, 94, 95–96). (Emphasis added).

Counsel for appellant closed defense arguments with the
following:

The facts of the case, the important facts of the case
focus on what happened that night. The Commonwealth,
however, has attempted and I think you will use your
judgement in this, in some respect to divert your atten-

tion from that and *that brings us to the next category of witnesses they called. Witnesses that, for lack of a better term, I would catalog the guilty by association witness.* That parade of witnesses who were called to this witness stand to say I have seen Ford Howard out there on the street from time to time with Craig Murphy. *It was a parade of witnesses, that I suggest to you, would have made Senator Joe McCarthy proud.*

\* \* \* \* \* \*

What I say to you is, try to remember the feelings that you had as you sat here, as jurors and listened to Keith Johnson. Try to remember the mental processes that you went through as he testified and as Bernard Williams testified and Sonja Mackie testified. Go back in time and ask yourselves: as I sat here listening to them, was I laughing at them? That they were so unbelievable? Was I thinking to myself, how could anyone expect us to deal with the fate of human beings lives based on testimony such as this?

Because, I think when you do that, if you go back in time and remember your feelings, from that actual moment when they were before you, you will realize that what you said to yourselves then was no, no way.

(N.T. 12/26/85 at 110, 115). (Emphasis added).

The prosecutor then responded with the following argument:

It was rather ironic ladies and gentlemen, the tack that was taken by the defense in this case. It was ironic in the sense that very seldom does the defense put before you the fact that someone has been convicted. And they put before you that the [reputed] head of this group, Craig Murphy, had already been convicted of murder in the first degree. Now, I told you initially that I would not apologize for any of my witnesses. Thousands of words have been written, been taken down, been made exhibits. You have the final word in this trial, in this drama, this drama that the defense would have you believe, as per their opening, came from some fantasy

world and they paraded before you testimony from two other proceedings and preliminary hearings and said this is fantasy. But, they contradict that by saying Craig Murphy has already been convicted on the testimony of the witnesses that you heard. Does that make sense?

MR. HAMILTON: Objected to, Your Honor.

MR. GREEN: Objection, Your Honor.

THE COURT: Proceed.

MR. KING: We didn't invent these witnesses. We didn't create them. We don't need any new witness. We will go with what has brought us this far. And let's talk about one down and four to go—

MR. GREEN: Objection.

MR. HAMILTON: Objection.

MR. FRANZEL: Objection.

MR. GREEN: Improper argument, Your Honor.

THE COURT: Proceed.

MR. KING: Let's talk about one down and four to go.

Mr. Green stood up before you and asked you where was the beef. I stand here and tell you we know where the beef is. . . .

(N.T. 12/27/85 at 6–8). Elsewhere in his closing argument, the prosecutor repeated the phrase "one down four to go" three times. (N.T. 12/27/85 at 29, 32–33, 38). There is no doubt that these remarks constituted improper argument to the extent that they suggest to the jury that another jury had convicted Craig Murphy *on the same evidence. Cf. Commonwealth v. Clayton,* 506 Pa. 24, 483 A.2d 1345 (1984); *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460 (1984).

Nonetheless, the issue on appeal is not whether the remarks were improper, but whether the trial court abused its discretion in concluding that the improper remarks did not unavoidably prejudice the jury so as to require a new trial. In reviewing the trial court's decision, we must consider the context in which the remarks were made. *Commonwealth v. Johnson,* 516 Pa. 527, 532, 533 A.2d 994, 997 (1987), *citing Commonwealth v. Dickerson,* 406 Pa.

64

102, 110, 176 A.2d 421, 425 (1962). As the foregoing excerpts indicate, the challenged remarks were preceded by closing arguments by co-defense counsel who took full advantage of the loose rein held by the trial judge over those arguments. We must also consider the trial court's superior vantage from which to view the remarks. The trial court saw and heard the entire proceedings, including the challenged remarks; we attempt to resurrect their meaning and effect from a cold transcript. *Cf. Commonwealth v. Griscavage*, 512 Pa. 540, 546, 517 A.2d 1256, 1259 (1986) (recognizing the trial court's "... unique opportunity to hear subtleties of answers and movements of witnesses and parties not viewable from the cold record").

Upon review of the record, I do not find that the improper remarks resulted in unavoidable prejudice. The prior conviction of Craig Murphy and the testimony of various witnesses at the prior proceedings were properly presented to the jury by the co-defense counsel before the improper remarks by the prosecutor were made. Though I agree the remarks should not have been made, I have full confidence in the trial court's conclusion that, *in the peculiar context of this case,* they were not such as would sweep the jury away in a tide of emotion and prejudice. Hence, I agree that no new trial is required on account of the remarks.*

WIEAND, Judge, dissenting:

I respectfully dissent. Although I agree with the majority that the tactics employed by the prosecuting attorney evinced "an irresponsibility which conflicts with the public trust placed in its office," I am unable to agree that the prosecutor's misconduct was harmless. Not only did the prosecuting attorney blatantly display to the jury his file box which listed the names of Craig Murphy and four other defendants, with a check mark in front of Murphy's name,

---

* I note that as to both defense counsel and prosecutors, trial courts may impose direct contempt sanctions on offending counsel for misconduct instead of or in addition to granting motions for mistrial. The appropriateness of such sanctions in particular cases is, of course, left to the discretion of the trial courts.

but counsel for the Commonwealth repeatedly argued to the jury that there was "one down and four to go." This was more than an error of judgment. It was an intentional series of remarks calculated to impair the defendant's right to a fair trial by having the jury focus on an irrelevant and highly prejudicial fact, namely, that another jury had found Murphy, a confederate, guilty "on the testimony of the witnesses that you heard." See: *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460 (1984). Cf. *Commonwealth v. Clayton*, 506 Pa. 24, 483 A.2d 1345 (1984).

In my judgment, it was also error for the trial court to refuse a defense request, made after Officer William Thomas and Sgt. William Schmid had testified, to require the Commonwealth to produce for examination by defense counsel the written statements which these witnesses had given to police who were investigating the homicide. See: *Commonwealth v. Hamm*, 474 Pa. 487, 378 A.2d 1219 (1977); *Commonwealth v. Grayson*, 466 Pa. 427, 353 A.2d 428 (1976).

Finally, I am of the opinion that the extrajudicial statements made by Toby that she had seen "three guys in the park" and that "Muscles didn't come out" were hearsay and did not fall within any exception to the hearsay exclusion. In the final analysis, however, these statements were so insignificant as to be inconsequential. The erroneous receipt of evidence of these statements, therefore, was harmless.

That appellant is guilty of participating in the taking of Reynolds' life is probably true. In that event, he will be found guilty upon a retrial. In the meantime, my belief that he is probably guilty cannot be permitted to override my observation that he was denied a fair trial according to established legal principles. If the judiciary becomes so result oriented that it begins to shortcut established principles of law in order to achieve desired results, we will all be the poorer for it. In that event, the rule of law of which we are so proud will be brought into disrepute, and a government under law will be replaced by a government of men

66

and women. I am of the opinion that appellant was deprived of a fair trial in this case. Therefore, I would reverse the judgment of sentence and remand for a new trial.