556 A.2d 403

**COMMONWEALTH of Pennsylvania**

v.

**Morris WILLIS, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 26, 1989.

Filed March 23, 1989.

---

12

Daniel M. Preminger, Philadelphia, for appellant.

Catherine Marshall, Assistant District Attorney, Philadelphia, for Com., appellee.

Before BROSKY, McEWEN and OLSZEWSKI, JJ.

OLSZEWSKI, Judge:

This is an appeal from judgment of sentence after appellant was convicted by a jury of first degree murder and

criminal conspiracy. Appellant presents four issues for our review: (1) whether the evidence was insufficient to establish beyond a reasonable doubt that appellant was either a principal, an accomplice, or a conspirator in Reynolds' murder; (2) whether the trial court committed reversible error when it allowed the Commonwealth to introduce into evidence the unredacted prior recorded testimony of Francine Williams; (3) whether the trial court committed reversible error when it refused to instruct the jury to consider whether Williams was an accomplice in the murder of Reynolds; and (4) whether a new trial is required because of prosecutorial misconduct during final argument to the jury. For the reasons below, we affirm.

On December 28, 1985, appellant was found guilty by a jury of first degree murder and criminal conspiracy. After a penalty hearing held on December 31, 1985, the jury imposed a life sentence for murder. At the formal sentencing on September 3, 1986, the trial court denied post-trial motions and imposed the life sentence for first degree murder and a ten-to-twenty year consecutive term of imprisonment for criminal conspiracy. On September 17, 1986, after reconsideration, the trial court reduced the prison term for conspiracy to five-to-ten years. This appeal is before us.[1]

Appellant first argues that the evidence was insufficient to support his conviction for first degree murder and conspiracy. The standard for reviewing a sufficiency of the evidence claim is well established:

[W]hether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond

---

1. Appellant's original appeal was dismissed by this Court for failure to file a Pa.R.A.P. 1925(b) statement pursuant to a trial court order. Represented by new counsel, appellant filed a petition under the Post Conviction Hearing Act, 42 PA.C.S.A. 9541 et seq., alleging trial counsel's ineffectiveness for failing to file a Rule 1925(b) statement. Thereafter, the trial court granted appellant the right to file the statement *nunc pro tunc.*

> a reasonable doubt.... The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence ... Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered ... Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to belive all, part or none of the evidence. (Citations omitted.)

*Commonwealth v. Griscavage*, 512 Pa. 540, 543, 517 A.2d 1256, 1257 (1986), *quoting Commonwealth v. Harper*, 485 Pa. 572, 576–577, 403 A.2d 536, 538–539 (1979).

The Commonwealth aptly summarizes the evidence presented at trial as follows:

> [O]n the evening of August 31, 1983, Craig Murphy, sitting in his black and silver Lincoln Continental at 15th and Clearfield Streets in Philadelphia, told Bernard Williams to take a ride with him. After Murphy made a telephone call in a nearby phone booth, he drove Williams to the Motorcycle Club, a gambling house at Germantown and Hilton Avenues, which both men entered. Williams left the club about thirty minutes later and went to the Mark V lounge across the street.... At approximately 10:30 p.m. that evening, Keith Johnson saw Murphy and co-defendants Rodney Wells, Ford Howard, and Esau Burroughs plotting in the front room of the Motorcycle Club "how they were going up Nicetown to kill this guy Muscles...." Murphy and co-defendant Howard were showing co-defendants Wells and Burroughs their guns. Johnson heard [Howard] state that he was "going up there to kill the [m____f____]" and that "he wasn't going to be playing".... After witnessing this exchange, Johnson entered another room to gamble, but returned to the room where the co-conspirators were about five minutes later. There, he heard co-defendant Ford Howard repeat how he was going to shoot the victim. Howard, Rodney Wells and Craig Murphy, all armed with guns, then left

the club house ... and got into the car.... After they left, Johnson asked co-defendant Burroughs, who had remained at the club, if the cohorts really were going to kill someone and Burroughs confirmed the plan....

Bernard Williams, who was leaving the Mark V lounge at this time, saw Howard, Murphy and Wells as they exited the Motorcycle Club. Murphy told Williams to come with the three men, and Williams, who was uninformed of the murder plan, got in the back seat of the car. During the drive, Williams overheard Murphy speak to Howard about drugs, saying that he had "to take care of business" with the victim and Howard....

Upon arriving at Hubert and Westmoreland Streets, Murphy told Howard and Wells to get out of the car. Murphy backed up the car to Hubert Street, told Williams to get in the front seat, and then walked down the street. Several minutes later, Williams, who had remained in the car, heard three gunshots. Three or four minutes after the shots, Murphy returned to the car without Ford Howard or Rodney Wells.... Williams asked Murphy if he had heard the gunshots, and Murphy responded, "Yeah," and also confirmed that he had taken "care of [his] business".... Murphy then drove back to 15th and Clearfield where Williams left the car ....

Officer Leslie Gunter, on patrol in the 2100 block of West Ontario Street between 12:15 and 12:35 a.m. on September 1, 1983, heard what he believed to be four or five firecrackers. Seconds later, the officer received a radio report of gunshots from the playground at 20th and Ontario Streets. Gunter arrived at this location within minutes of receiving the radio call and after searching the area, discovered the victim, James "Muscles" Reynolds, lying on the ground on the side of the playground. The officer saw bullet wounds in the back of the victim's head and near his left eyebrow ..., and arranged the transportation of the victim to Temple Hospital where he was pronounced dead. While securing the crime scene, Officer Gunter saw defendant Morris Willis and his brother

standing on the corner of 20th and Ontario watching the activity....

At about 2:00 a.m., on September 1, 1983, Ford Howard, Rodney Wells and Craig Murphy returned to the Motorcycle Club, kicked open the door and entered, brandishing their .38 guns. Howard announced to Esau Burroughs, who was already at the club, that he had shot the victim in the head, and Rodney Wells confirmed that the victim was dead. Howard then gave Burroughs his .38 firearm. At that point, Murphy ordered them to "get the hell out of there" because police were on Germantown Avenue, and Howard, Wells and Murphy left the club....

Earlier on the night of the shooting, around midnight, defendant, who worked in Craig Murphy's drug distribution operation selling cocaine, telephoned the victim and the victim's wife, Sonia Mackie. Defendant told the victim and Mackie to meet him at the park at 20th and Ontario Streets to speak to Murphy about $800 the drug operation owed the victim. Mackie decided to stay home, however, and the victim went to the playground alone. When defendant arrived at 20th and Ontario, he told the victim to go into the park and wait while defendant got a package from his house. While on his porch steps, defendant heard gunshots, and immediately called Ms. Mackie to tell her that her husband had been shot in the playground. Mackie saw defendant at the park when she went there to verify his telephone call, and later confronted defendant at the police station because she believed he had telephoned the victim to "set him up" to be murdered. Ms. Mackie also testified that Ford Howard subsequently showed her the gun used to kill her husband, admitted that he had been present at the murder, and informed her that Murphy had ordered him to kill her too....

After the police transported the victim to Temple Hospital, defendant arrived soon thereafter and asked Officer Erman Hendricks if the victim was "dead." The officer replied that he did not know the victim's medical status.

Defendant subsequently repeated his inquiry, explaining that because there were no police at the murder scene, he had come to the hospital with his questions. Officer Hendricks, who was aware that other officers were indeed present at the crime scene, became suspicious and asked defendant if he would speak to homicide detectives about the matter, and defendant agreed.

Defendant voluntarily made a statement to Detective Joseph Brignola approximately one hour after the murder in which he denied any knowledge of the offense or the identity of the killers, and insisted that he had not "set up" the victim. Although defendant admitted that he owed the victim $800, he claimed that he telephoned the victim a few hours before his death to arrange a meeting so the victim could "test" some of defendant's cocaine. According to defendant's statement, he and the victim went to a "shooting gallery" at 20th and Westmoreland Streets to try the cocaine, and afterwards, at the victim's own suggestion, they went to the playground at 20th and Ontario. Defendant claimed that the victim volunteered to wait in the park while defendant obtained more cocaine from his home nearby. Inside his house, defendant heard the three gunshots which resulted in the victim's death. Detective Brignola testified that he did not believe defendant's statement and accused him of lying.

Six or seven hours after his statement to Detective Brignola, defendant announced that he was leaving for California, claiming that he was afraid he too would be killed. Officer Raymond Thomas verified that, after that point, he lost regular contact with defendant (who had acted as an informant for him in the past) for approximately one year. Detective John Cimino testified that in May 1985, he arrested defendant in San Bernardino, California. Subsequently, in November 1985, defendant telephoned Officer Thomas and asked if the officer recalled a conversation with defendant the day after the murder and also inquired about the substance of Officer Crawley's testimony. Officer Thomas refused to discuss the matters with defendant. . . .

Medical Examiner Dr. Paul G. Hoyle testified that the cause of the victim's death was seven gunshot wounds, three to the head, four to the trunk and arms, and the manner of death was homicide. Dr. Hoyle's examination of the victim's body also revealed no evidence of recent narcotic use, particularly not within the last few hours of his life, contrary to defendant's statement to the police that the victim had tested some cocaine for him just before his death....

Appellee's brief at 3–9 (citations and footnotes omitted). It is evident that appellant agreed to participate in the victim's murder and aided his co-conspirators accomplishing that end. There is sufficient evidence to support the conclusion that appellant telephoned the victim just prior to the killing to lure him to the playground, where the gunmen waited, by promising the return of $800 owed him by Murphy's drug operation. In addition, the jury could have reasonably inferred that appellant subsequently checked the victim's medical status at the hospital to determine the success of the murder plan, and then fled the jurisdiction to avoid prosecution.[2] Given the standard of appellate review applicable in appeals from convictions, we find the evidence was sufficient to support appellant's convictions.

**2.** Appellant argues that appellant's flight from the jurisdiction does not support an inference of guilt because he did not know he was wanted in connection with the crimes at issue. We disagree.

When a person commits a crime, knows that he is wanted therefor, and flees or conceals himself, such conduct is evidence of consciousness of guilt, and may form the basis in connection with other proof from which guilt may be inferred.

*Commonwealth v. Osborne*, 433 Pa. 297, 302, 249 A.2d 330, 333 (1969) (citation omitted). Instantly, the Commonwealth showed that: (1) after the police transported the victim to the hospital, appellant arrived soon thereafter and asked a police officer if the victim was "dead;" (2) appellant voluntarily made a statement to Detective Brignola who, after the statement was made, accused appellant of lying; (3) six or seven hours after his statement to Detective Brignola, appellant announced that he was leaving for California; and (4) for approximately one year, Officer Raymond Thomas lost regular contact with appellant who had acted as an informant for the officer in the past. This was sufficient evidence from which the jury could reasonably infer that appellant knew he was subject to prosecution and, therefore, fled.

■ Second, appellant contends that the trial court committed reversible error when it allowed the Commonwealth to introduce into evidence the unredacted prior recorded testimony of Francine Williams. Specifically, appellant maintains that the trial court erred in admitting Francine Williams' prior recorded testimony because appellant had no opportunity to cross-examine the witness.[3] Francine Williams testified at the first trial of co-defendant Rodney Wells which resulted in a mistrial in June, 1985. In the instant case, after an *in camera* evidentiary hearing to determine the unavailability of the witness, the trial court permitted Detective Brignola to read the prior recorded testimony to the jury to be considered against Wells. The Commonwealth aptly summarized the prior recorded testimony as follows:

[O]n the night of the murder, which was located directly across from the playground at 20th and Ontario Streets. She saw a man, who resembled co-defendant Rodney Wells, approach defendant's house next door and ask "where was his brother Morris." The man then walked back toward the playground. Approximately fifteen minutes later, Ms. Williams saw the victim enter the playground after speaking with defendant. At that point, Williams heard three gunshots from "close by" and additional gunfire when she went inside her sister's house. During her subsequent police interview, Ms. Williams recounted what she had witnessed and identified a photograph of Rodney Wells as resembling the man who had gone to defendant's house on the night of the murder. Williams also testified that she was not certain of her identification of Rodney Wells because it was dark and

3. Appellant also maintains that the Commonwealth failed to prove that the notes of testimony were authentic. Specifically, appellant maintains that the court stenographer who transcribed Ms. Williams' testimony was required to testify regarding the content and accuracy of the notes of testimony. We disagree. Ms. Williams' testimony was transcribed by an official court reporter. Consequently, there was no need to have the reporter testify as to the accuracy of the notes. *Commonwealth v. Weitkamp*, 255 Pa.Super. 305, 386 A.2d 1014 (1978); *Ingram v. Pittsburgh*, 346 Pa. 45, 29 A.2d 32 (1942).

she did not fully see his face on the night of the murder. . . .

Appellee's brief at 13 (citations omitted).

It is well established that "the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him." *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926, (1965). Furthermore, in Pennsylvania, 42 Pa.C.S.A. § 5917 [4] provides for the admission of former testimony of a witness in a criminal case provided, *inter alia*, the defendant was present at the time the former testimony was taken and had an opportunity to examine or cross-examine the witness. *Commonwealth v. Galloway*, 476 Pa. 332, 336, 382 A.2d 1196, 1198 (1978).

Instantly, the record indicates that Ms. Williams' testimony was admitted solely against co-defendant Rodney Wells. Immediately following the detective's reading of Ms. Williams testimony, the trial court instructed the jury as follows:

Ladies and gentlemen of the jury, once again, I want to remind you that this testimony that was read to you by Francine Williams was in a prior proceeding, prior to this trial, and that was a proceeding the Commonwealth versus Rodney Wells.

The other defendants, Ford Howard, Morris Willis and Esau Burroughs were not a part of that proceeding. Therefore, I'm directing you that you consider this evidence or this testimony, of Francine Williams, as to Rodney Williams only. And you must not consider it against Ford Howard, Morris Willis or Esau Burroughs.

**4.** 42 Pa.C.S.A. § 5917 provides in pertinent part:

Whenever a person has been examined as a witness, either for the Commonwealth or for the defense, in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross-examine, if such witness afterwards die, or is out of the jurisdiction so that he cannot be effectively served with a subpoena, or if he cannot be found, or if he becomes incompetent to testify for any legally sufficient reason properly proven, notes of his examination shall be competent evidence upon a subsequent trial of the same criminal issue.

N.T., 12/18/85 at 92. Given these circumstances, we find the trial court did not err in admitting Ms. Williams' prior testimony. Ms. Williams was not a witness against appellant. Consequently, appellant's constitutional right to confrontation was not violated nor were the statutory requirements of 42 Pa.C.S.A. § 5917 applicable to appellant.[5]

Appellant, however, contends that, despite the fact that Ms. Williams was not a witness against appellant, specific references to appellant in Ms. Williams' testimony created a confrontation violation. We disagree.

In *Bruton* [*v. U.S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)], co-defendant Evans' confession, which implicated Bruton in a robbery, was read to the jury. The trial court, in accord with *Delli Paoli v. U.S.*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), admitted the confession unedited and cautioned the jury that Evans' confession was inadmissible hearsay against Bruton and was to be considered only against Evans. Evans exercised his privilege not to testify. The Supreme Court set aside Bruton's conviction, overruling *Delli Paoli* because "of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt." 391 U.S. at 126, 88 S.Ct. at 1622. The Court emphasized that Evans' statement was "powerfully incriminating" as to Bruton since it directly inculpated him in the crime and

5. Appellant contends that the trial court's final charge contradicted the trial court's instant instructions. We disagree. In its final instructions, the trial court stated that the jury could consider only the evidence that came from the witness stand. The trial court, however, informed the jurors that this general rule did not apply to the recorded testimony of Francine Williams and, therefore, the jurors could consider Williams' testimony despite her unavailability to testify. We agree with the Commonwealth that the trial court's final charge was consistent with its earlier instructions. The jurors were already aware that Ms. Williams' recorded testimony was admissible only against co-defendant Wells, and the trial court's final instruction advised them only that her testimony could not be considered inferior to the other evidence presented simply because she was not present at trial. *See Commonwealth v. Newman*, 323 Pa.Super. 394, 401, 470 A.2d 976, 980 (1984) (charge to jury must be read as a whole and will be found adequate if it reflects the law and is sufficient to guide the jury in its deliberations).

that Evans' confession "added substantial, even critical, weight to the Government's case." [I]d. at 128, 88 S.Ct. at 1623. The Court thus held that Bruton had been denied his right of confrontation since Evans' extrajudicial statement inculpating him went to the jury without Bruton having the opportunity to cross-examine Evans. *Commonwealth v. Rawls,* 276 Pa.Super. 89, 94, 419 A.2d 109, 111 (1980). In the case *sub judice,* any references to defendant in Ms. Williams recorded testimony were not "powerfully incriminating" nor added "substantial, even critical, weight" to the Commonwealth's case. Appellant's own voluntary statement to the police, which was introduced at trial, essentially corroborates Ms. Williams' prior recorded testimony. In addition, we do not find Ms. Williams' tentative identification of Wells as the individual at appellant's house critical to appellant's conviction. There was other evidence that established appellant's complicity in the murder. This evidence included appellant's telephone call to the victim and his wife to lure them to the playground, and co-defendant Howard's subsequent admission that they had planned to kill Ms. Mackie as well, had she accompanied the victim as appellant had requested. The prosecutor's summation further illustrates that Ms. Williams' identification was not critical to the Commonwealth's case. The prosecutor referred to Francine Williams' testimony only to the extent that it implicated co-defendant Wells by placing him near the scene of the crime. No mention was made of Wells' presence at appellant's house. Accordingly, we find no confrontation violation occurred.

Third, appellant argues that the trial court committed reversible error when it refused to instruct the jury to consider whether Williams was an accomplice in the murder of Reynolds. This issue was raised by co-defendant, Ford Howard, in *Commonwealth v. Howard,* 375 Pa.Super. 43, 543 A.2d 1169 (1988). Based upon the same record, this Court concluded that the trial court correctly determined that Williams was not an accomplice to the murder and, accordingly, no error occurred when the trial court refused

to so charge the jury. *Id.*, 375 Pa.Superior Ct. at 50, 543 A.2d at 1173. We find no reason to reconsider this claim. Accordingly, appellant's claim is without merit.

■ Finally, appellant argues that a new trial is required because of prosecutorial misconduct during final argument to the jury. Specifically, appellant maintains that the prosecutor committed misconduct: (1) by referring to the fact that Craig Murphy had already been convicted for his participation in the victim's murder;[6] and (2) by placing his trial file boxes, which were marked with all five conspirators' names, in the courtroom. Again, this Court, based upon the same record, addressed these issues in *Howard.* Regarding the reference to Craig Murphy and other co-conspirators, this Court found that the reference was not "fatally prejudic[al]." With respect to the prosecutor's use of the trial boxes, this Court agreed with the "conclusion of the trial court that the presence of the box did not so sway the passions of the jury as to have rendered them incapable of weighing the evidence and rendering a true verdict." *Id.*, 375 Pa.Superior Ct. at 56, 543 A.2d at 1176. We find no basis to reconsider appellant's contentions. Consequently, appellant is not entitled to a new trial.

Judgment of sentence is affirmed.

---

6. The prosecutor stated, "One down and four to go."