## Slaughter v. R.D. Werner Co. Inc.

*John McFadden and Joseph McFadden,* for plaintiffs.
*Edward R. Murphy* and *Leslie Dymond Marks,* for defendant R.D. Werner.

GOLDMAN, *J.,* June 28, 1995—

I.

On June 29, 1988, plaintiff Wayne Slaughter was employed as a service technician for Bell of Penn-

sylvania. He had worked in this capacity for 18 years and frequently used fiberglass extension ladders in carrying out his job duties. (N.T. 79-81.) On June 29, 1988, Mr. Slaughter was using a 24 foot fiberglass extension ladder manufactured by defendant R.D. Werner Company. The ladder's fiberglass side rails were manufactured by Morrison Molded Fiberglass Company.

On June 29, 1988, Mr. Slaughter was repairing a phone line for the Bartram Village Housing Authority. (N.T. 86.) He was standing on the ladder when the fiberglass rails broke causing the ladder to collapse. (N.T. 99.) Mr. Slaughter fell to the ground and sustained serious ankle injuries. (N.T. 100.) The injuries resulted in eight operations including a grafting procedure. He never returned to his job as a service technician and did not work at all after April 1992. (N.T. 113, 118.)

Plaintiffs instituted this suit against Werner and Morrison alleging that the subject ladder was defectively designed.[1] They contended inter alia that the ladder's brackets, manufactured by Werner, cut into the fiberglass side rails causing them to break. Plaintiff Wayne Slaughter sought damages for his ankle injuries and loss of wages and employment. Plaintiff Deborah Slaughter sought damages for loss of consortium.

A jury trial was held from October 14, 1994 to October 21, 1994. The jury returned a verdict in favor of plaintiffs awarding $1,440,535 to Wayne Slaughter and $60,000 to Deborah Slaughter. The court entered an order on November 30, 1994 adding delay damages of $369,120 to Wayne Slaughter's award and molding the total verdict to $1,869,655.

Defendant timely filed post-trial motions. It contends that it is entitled to a new trial for the following reasons:

---

1. Morrison was dismissed from the suit pursuant to a court order dated September 14, 1994.

(1) the court erred in not allowing defendant to prove that it manufactured the ladder according to Bellcore's specifications (2) the court erred in not allowing defendant to present evidence of statements contained in Mr. Slaughter's hospital emergency report (3) the court improperly allowed plaintiffs' expert to testify about matters outside the scope of the expert's reports and (4) the court erred in its charge. Defendant also petitions this court for a remittitur arguing that plaintiffs' economic expert used an inaccurate method to calculate Mr. Slaughter's future wage loss. Lastly, defendant contends that it is entitled to judgment notwithstanding the verdict because plaintiffs presented insufficient evidence to prove that the ladder was defective. As discussed more extensively below, defendant's post-trial motions were denied.

## II.

It is well-settled law that it is in the trial court's sound discretion whether to grant a new trial. Dom *v. Stanhope Steel Inc.,* 368 Pa. Super. 557, 581, 534 A.2d 798, 810 (1987), *allocatur denied,* 518 Pa. 656, 544 A.2d 1342 (1988). A new trial is proper when the trial court "believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice." *Thompson v. City of Philadelphia,* 507 Pa. 592, 598, 493 A.2d 669, 672 (1985). However, a mere conflict in testimony is not grounds for a new trial. *Id.* Further, the court may grant a new trial when it committed an error of law which affected the outcome of the case. *Pollock Industries Inc. v. General Steel Castings Corp.,* 203 Pa. Super. 453, 201 A.2d 606, 612 (1964). In light of the above standards, defendant was not entitled to a new trial.

## A.

Defendant first argues that the court erred in not allowing evidence that defendant manufactured the allegedly defective ladder in accordance with the speci-

fications of Bellcore, the technical division of the Bell companies. The jury heard evidence that Bell Atlantic, Mr. Slaughter's employer, purchased the subject ladder from defendant. However, the jury did not hear evidence that Bellcore provided the design specifications for the ladder. Defendant argues that since plaintiffs alleged that the ladder was defectively designed, the refusal of this evidence was prejudicial error warranting a new trial. This argument must fail.

It is well established in this Commonwealth that a manufacturer is strictly liable for injuries caused by a defect in its product. See *e.g., Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 93, 337 A.2d 893, 898 (1975) (discussing history and policy behind strict products liability). Further, a manufacturer is essentially the guarantor of its product's safety. *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 32, 319 A.2d 903, 907 (1974). Finally, the Pennsylvania courts have repeatedly held that negligence issues are not proper inquiries in a strict liability action. *Berkebile, supra* at 94-95, 337 A.2d at 899. Based on these principles, the court properly disallowed evidence regarding defendant's reliance on the Bellcore specifications.

As plaintiffs argue, this evidence would have impermissibly involved negligence issues. A review of the Bellcore specifications would have led to an analysis of defendant's reasonableness in relying on the designs. This examination would have violated the Supreme Court's mandate against "injecting negligence concepts into strict liability theory." *Berkebile, supra* at 94, 337 A.2d at 899. Further, a primary theory behind strict liability is that sellers and manufacturers are in the best position to bear the risk of loss for injuries caused by their defective products. *Walton v. Avco Corp.,* 530 Pa. 568, 575, 610 A.2d 454, 458 (1992). Allowing the manufacturer to present a defense which would have shifted the risk away from itself would have undermined a basic theory of strict products liability.

Moreover, as the court noted in its ruling on plaintiffs' motion in limine to preclude the introduction of defendant's reliance on the Bellcore specifications, there is no Pennsylvania authority holding that complying with design specifications is a defense. (N.T. 21, 179-80.) In the absence of such authority, it would be improper to introduce a new defense into the strict liability arena. Although in its brief defendant points to several cases which it contends support its position, these cases are unpersuasive.

Defendant first relies on *Carter v. Joseph Bancroft & Sons Co.,* 360 F. Supp. 1103 (E.D. Pa. 1973) for the proposition that a product's designer can be held liable for injuries caused by a defect in the product. *In Carter,* the defendant was not the manufacturer of the product, a dress, but the company whose name appeared on the dress' label. *Id.* at 1105. The label identified the defendant as the company who "prescribed and controlled" the quality standards and specifications of articles bearing its trademark. *Id.* at 1 106. The plaintiff sued the defendant after the dress caught on fire. *Id.* at 1105. The court found that the defendant was a "seller" under Restatement (Second) of Torts §402A and could be held strictly liable. *Id.* at 1106.

However, in reaching its decision, the court emphasized that the defendant's name appeared on the label. Quoting Restatement (Second) of Torts §400, which the Pennsylvania Supreme Court adopted in *Forry v. Gulf Oil Corp.,* 428 Pa. 334, 237 A.2d 593, 599 (1968), the court said:

"Thus, one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark. When such identification is refer-red to on the label as an indication of the quality or wholesomeness of the chattel, there is an added emphasis that the user can rely upon the reputation of the person so identified." *Carter,* 360 F. Supp. at 1107

(quoting Restatement (Second) of Torts §400, comment d). Accordingly, the court found the defendant could be strictly liable under section 402A.

The facts in *Carter* are not present in the instant case. Bellcore's name did not appear on the ladder, and it did not hold out the ladder as its own product. Further, in *Carter,* the plaintiff actually sued the designer while here the defendant was attempting to shift liability to Bellcore as the "designer." *Carter* does not allow the manufacturer, guarantor of the product, to escape liability by showing it relied on another entity's designs.

Defendant also cites *Lesnefsky v. Fischer & Porter Co.,* 527 F. Supp. 951 (E.D. Pa. 1981) and *Orion Insurance Co. v. United Technologies Corp.,* 502 F. Supp. 173 (E.D. Pa. 1980) in support of its argument that evidence of its compliance with the Bellcore specifications should have been admitted. However, those cases are not applicable here. In *Lesnefsky,* the court held that the defendant who manufactured a component part of a product according to the specifications of the purchaser, the plaintiff's employer, would not be liable for the part's defective design. *Lesnefsky, 527* F. Supp. at 955. Yet, in reaching its decision, the court emphasized that the purchaser had more knowledge and experience in designing these parts than the defendant manufacturer. *Id.* Moreover, the court noted that it would be unfair to require "the component manufacturer to hire experts, at great cost, to review specifications provided by an experienced purchaser in order to determine whether the product design will be safe for its intended use." *Id.*

*In Orion,* the court found that a manufacturer of a component part, who manufactured the part according to the product manufacturer's specifications, would not be liable for a design defect. *Orion,* 502 F. Supp. at 177. As in *Lesnefsky,* the court relied heavily on the fact that a business entity with "superior knowledge"

furnished the specifications to the component part manufacturer. *Id.* at 176. Further, the alleged design defect arose from the part's incorporation into the finished product. *Id.* at 175.

The instant case can be distinguished from the facts in *Lesnefsky and Orion.* First, defendant is not a component part manufacturer. It manufactured the whole ladder except for the side rails which were manufactured by Morrison. Also, Bellcore did not have superior knowledge and experience in the field of designing ladders. In fact, Dale King, defendant's product engineering manager, testified as to his knowledge regarding fiberglass ladders. He stated that when the subject ladder was manufactured he was working almost exclusively with fiberglass ladders. (N.T. 390.) With regard to his experience, Mr. King explained that he developed new ladders, redesigned existing ladders and specially designed products for particular customers. (N.T. 390.) Thus, the evidence demonstrated that defendant was experienced in the ladder industry and was not looking to Bellcore as possessing superior knowledge. Therefore, the line of cases dealing with component part manufacturers is inapplicable.

Further, in another case in the Eastern District of Pennsylvania, the court stated that a supplier could be strictly liable for a defect in the product even if the purchaser submitted the product's specifications. *Abdul-Warith v. Arthur G. McKee & Co.,* 488 F. Supp. 306, 311 (E.D. Pa. 1980), *affirmed,* 642 F.2d 440 (3d Cir. 1981). The court noted that a manufacturer's reliance on the buyer's specifications could be a defense in- a negligence action. *Id.* However, it did not extend that defense to strict liability actions. *Id.* Thus, in light of the case law, the court did not err in not allowing evidence of defendant's compliance with Bellcore specifications to be presented to the jury. Therefore, the motion for a new trial on this ground was denied.

## B.

Defendant next argues that it is entitled to a new trial because the court did not permit defendant to introduce statements contained in Mr. Slaughter's hospital emergency report. Specifically, defendant contends that it should have been allowed to present evidence of the hospital report which stated "the plaintiff 'tripped on a ladder may have fallen 15-20 feet and landed' on his right foot." (Defendant's brief, p. 11.) Plaintiffs submitted a motion in limine seeking to preclude this evidence on the grounds that it was inadmissible hearsay. The court granted the motion, and defendant argues that this was prejudicial error. This contention fails.

A business record is recognized as an exception to the hearsay exclusion. Thus, defendant sought the admission of the emergency room record under the Uniform Business Records as Evidence Act, 42 Pa.C.S. §6108 which provides:

*"(b) General Rule.—A* record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission." (emphasis added) 42 Pa.C.S. §6108.

Moreover, the Pennsylvania courts have established a test to determine the admissibility of medical reports under the business records exception to the hearsay rule. Defendant argues that the record in this case met the three criteria set out by the Pennsylvania courts for the admission of hospital records.

"A medical report is admissible under the business records exception to the hearsay rule if the report: (1) was made contemporaneously with the events it purports

to relate, (2) at the time the report was prepared, it was impossible to anticipate reasons which might arise in the future for making a false entry in the original, and (3) the person responsible for the statements contained in the report is known." *Isaacson v. Mobil Propane Corp.,* 315 Pa. Super. 42, 49, 461 A.2d 625, 629 (1983).

However, the requirements of *Isaacson* were not met. It was not clear that Mr. Slaughter actually made the statement that he "tripped," and thus the person responsible for the statement in the report was unknown. *Isaacson* states that it's the identity of the person supplying the information that must be known, not the identity of the physician making the record. *Id.* Thus, the report did not qualify as a hearsay exception under *Isaacson* and the Uniform Business Records as Evidence Act.

Moreover, the entry in the record cannot be admissible because it was not "pathologically germane" to the physical condition "which caused the patient to come to the hospital for treatment." *Scannella v. Salerno Importing Co.,* 2 Pa. Commw. 11, 15, 275 A.2d 907, 909 (197 1). The Pennsylvania Supreme Court has held that while statements to a doctor are admissible when necessary for diagnosis and treatment, statements relating to the cause of injury are not admissible. *Cody v. S.K.F. Industries Inc.,* 447 Pa. 558, 563, 291 A.2d 772, 776 (1972).

In the instant case, plaintiff's alleged statement was not necessary for diagnosis or treatment. Rather, the statement that he "tripped" on the ladder was a statement of fact which sought to explain how he fell and related solely to the cause of injury. The fact that Mr. Slaughter fell to the ground was "pathologically germane" to the physical condition which caused him to come to the hospital. But, the issue of *how* he fell did not refer to the general nature of the injury and was unrelated

to Mr. Slaughter's medical treatment. Thus, the evidence was hearsay and was inadmissible.

Since the evidence at issue in *Scannella* was ruled admissible, defendant relies on *Scannella* arguing that the facts in this case are analogous and that the statement regarding how plaintiff fell from the ladder should have been admitted into evidence. However, *Scannella* was a worker's compensation case in which the rules of evidence are usually relaxed. Here, in a non-worker's compensation case, where the traditional rules of evidence apply, the statement that was not "pathologically germane" to the physical condition of Mr. Slaughter was properly excluded.

We recognize that *Cody* also held that statements relating to cause and not "pathologically germane" can be admissible if they are part of the "res gestae." *Id.* However, the statement made in this case does not even fall under that exception. The Supreme Court has explained "res gestae" as covering four separate exceptions to the hearsay rule: "(1) declarations as to present bodily conditions; (2) declarations of present mental states and emotions; (3) excited utterances; and (4) declarations of present sense impressions." *Commonwealth v. Pronkoskie,* 477 Pa. 132, 137, 383 A.2d 858, 860 (1978). Plaintiff's alleged statement that he "tripped" on the ladder fails to qualify under any of these four res gestae exceptions. The statement was not a declaration of either the plaintiff's present bodily condition or his present mental state, but a statement of fact. It did not convey relevant information regarding plaintiff's physical condition, feelings, symptoms or present mental or emotional state. See generally, Leonard Packel and Anne Bowen Poulin, Pennsylvania Evidence §803.3, at 572-76 (1987) (discussing the admissibility of statements regarding physical and mental condition as exception to the hearsay rule). It conveyed only the cause of plaintiff's fall from the ladder.

Similarly, plaintiff's alleged extrajudicial statement was not an excited utterance or a present sense impression. The alleged statement was not shown to be "a spontaneous declaration by a person whose mind had been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence . . . ." Packel and Poulin, *supra* §803.2, at 562 (quoting *Allen v. Mack,* 345 Pa. 407, 410, 28 A.2d 783, 784 (1942)). Neither was it shown that Mr. Slaughter was observing an event which he was describing to another person who was also present at the scene. *See Commonwealth v. Blackwell,* 343 Pa. Super. 201, 218, 494 A.2d 426, 431-32 (1985) (outlining requirements for "present sense impression" exception to hearsay rule). Plaintiff's alleged statement did not relate to a contemporaneous observation of any event. It was, rather, a statement of a past event, i.e., that he had "tripped" on the ladder and fell 15-20 feet.

Therefore, since this statement related solely to the cause of plaintiff's injury, and was not part of the res gestae, nor pathologically germane to his physical condition, it was inadmissible hearsay. Accordingly, the motion for a new trial on this issue was denied.

## C.

Defendant next contends that the court erred in allowing plaintiffs' expert, Jack Vinson, Ph.D., to offer testimony regarding a defect in the thickness of the ladder's flange. It argues that this line of testimony exceeded the fair scope of Dr. Vinson's pretrial report. Defendant alleges that the jury verdict may have been based on this improper evidence, and thus it is entitled to a new trial. This argument must fail.

Pennsylvania Rule of Civil Procedure 4003.5 outlines the discovery process with regard to expert testimony. First, the rule allows a party to require the other party to identify those experts he or she intends to call at

trial and to state the expert's expected subject matter of testimony. Pa.R.C.P. 4003.5(a)(1)(a). Further, a party can discover "the substance of the facts and opinions to which the [identified] expert is expected to testify and a summary of the grounds for each opinion." Pa. R.C.P. 4003.5(a)(1)(b). This information may be supplied through an expert report. *Id.* The rule further explains that an expert's testimony at trial cannot "be inconsistent with or go beyond the fair scope of his testimony" in the report. Pa.R.C.P. 4003.5(c).

The courts have held that there are no definite rules for ascertaining whether an expert's testimony exceeds the fair scope of his or her pretrial report. *Wilkes-Barre Iron & Wire Works Inc. v. Pargas of Wilkes-Barre Inc.,* 348 Pa. Super. 285, 288, 502 A.2d 210, 212 (1985). Rather, a case by case analysis is appropriate. *Id.* However, in making the determination, the court must focus on whether the policy and purpose of Rule 4003.5 is being served. *Id.* Finally, the courts recognize that " '[flair scope' contemplates a reasonable explanation and even an enlargement of the expert's written words." *Id.* at 292, 502 A.2d at 213.

Applying these standards to the instant case, it should first be noted that defendant suffered no prejudice by Dr. Vinson's testimony about the thickness of the flange. Further, the testimony did not exceed the fair scope of the expert report. At trial, Dr. Vinson described how the thickness of the ladder's flange affected the strength of the side rails and the stress on the ladder. (N.T. 241.) In his pretrial report, Dr. Vinson set forth a formula to calculate the stresses on the ladder. (January 21, 1994 report, p. 5.) At trial, he testified as to the formula in his report explaining that the "H squared" variable in the formula referred to the thickness. (N.T. 240-41.) Thus, the testimony at trial regarding the thickness of the flange was merely a permissible explanation of the report. See *Wilkes-Barre, supra* at 292, 502 A.2d at

213 (stating that testimony at trial explaining pretrial report is within "fair scope" of report). See also, *Ruzzi v. Butler Petroleum Co.,* 527 Pa. 1, 13, 588 A.2d 1, 7 (1991) (expert did not exceed fair scope of report that addressed future wage loss by testifying at trial as to diminished earning capacity); *Butler v. Kiwi, S.A.,* 412 Pa. Super. 591, 602-603, 604 A.2d 270, 275-76 (1992) (testimony at trial regarding cause of accident and opining that helmet's latch system was not defective was within fair scope of expert report explaining latch system), *allocatur denied,* 531 Pa. 650, 613 A.2d 556 (1992). But see *DiBuono v. A. Barletta & Sons Inc.,* 127 Pa. Commw. 1, 11, 560 A.2d 893, 898 (1989) (expert's testimony at trial about plaintiff's need for future spleen surgery exceeded fair scope of pretrial report which only focused on existing disability and did not address spleen at all), *allocatur denied, 524* Pa. 632,574 A.2d 73 (1989); *Estate of Hannis v. Ashland State General Hospital,* 123 Pa. Commw. 390, 394, 554 A.2d 574, 576 (1989) (expert's testimony at trial regarding damages for pain and suffering exceeded fair scope of expert report that only addressed issues of liability), *allocatur denied,* 524 Pa. 632, 574 A.2d 73 (1989).

Further, allowing Dr. Vinson's testimony was consistent with the purpose of Rule 4003.5. The policy behind Rule 4003.5 is to eliminate unfair surprise and allow the other party to be prepared to respond to the expert testimony. *Wilkes-Barre, supra* at 290, 502 A.2d at 212. In fact, in determining whether testimony at trial exceeded the fair scope of a pretrial report, a controlling issue "is whether there has been surprise or prejudice to the party which is opposing the proffered testimony of the expert, based upon any alleged deviation between the matters disclosed during discovery, and the testimony of such expert at trial." *Trent v. Trotman,* 352 Pa. Super. 490,502,508 A.2d 580,587 (1986).

Based on the formulae in the pretrial report, defendant should not have been surprised by Dr. Vinson's testimony about the thickness of the flange and its significance. Further, in response to defendant's objection at trial to Dr. Vinson's testimony, the court allowed defendant's expert fully to respond to the objected testimony without regard to defendant's expert's report. (N.T. 240.) Thus, defendant was given a chance to cure any prejudice. However, as evidenced by his testimony, defendant's expert was prepared to respond to Dr. Vinson's testimony regarding the thickness of the flange. Russell Westmann, Ph.D., defendant's expert, opined that a high compression load in the flange caused the ladder to fail. (N.T. 506.) He further opined that the flange was thick enough for normal use and safe performance. (N.T. 511.) Thus, defendant was sufficiently prepared to respond to Dr. Vinson's testimony, and the purpose of Rule 4003.5 was not violated by allowing Dr. Vinson's testimony.

Defendant argues that *Wilkes-Barre* is analogous to this case and supports its contention that the testimony at trial exceeded the fair scope of the report. However, that case is inapposite here. In *Wilkes-Barre,* a products liability action, the plaintiff 's expert filed a pretrial report which opined that the defendant's liquid propane cylinder tank was defective. *Wilkes-Barre, supra* at 289, 502 A.2d at 212. In his report, the expert explained that the tank was defective because it did not have a collar around the valve which would protect the valve in the event that the tank fell. *Id.* At trial, the expert testified that the product was defective because it did not have a *permanently welded-on* protective collar. *Id.* The expert further testified that a mere detachable collar would not render the tank safe. *Id.* After a jury verdict for the plaintiff, the trial court found that the expert's testimony exceeded the fair scope of his pretrial report and should have been excluded. *Id.* at 287, 502

A.2d at 21 1. It granted the defendant a new trial, and the Superior Court affirmed. *Id.*

The Superior Court found that the expert's testimony at trial introduced a whole new design defect that was not contained in the report. *Id.* at 292, 502 A.2d at 213. Significantly, the new defect surprised the defendant, and prevented it from "preparing a meaningful response." *Id.* at 290, 502 A.2d at 213. Based on the expert's report, the defendant was ready to rebut the expert with evidence that the cylinder was delivered to the plaintiff's plant with a nonpermanent protective collar. *Id.* at 294, 502 A.2d at 214. This evidence would have constituted a defense to the action since according to the opinion in the report, the product was delivered in a safe manner. *Id.* However, the testimony at trial rendered that defense useless and unfairly prejudiced the defendant. *Id.*

The facts in *Wilkes-Barre* are not present in the instant case. Dr. Vinson opined that the ladder was defectively designed because it used sharp brackets that cut into and thus weakened the fiberglass side rails. In his report, Dr. Vinson used the thickness of the flange as a variable to analyze the ladder's failure. At trial, he explained the formula in his report and its significance regarding the failure. Contrary to *Wilkes-Barre,* he did not introduce a new theory of defect nor did he unfairly surprise defendant. Therefore, *Wilkes-Barre* does not apply here, and there was no error in allowing the testimony at trial. Accordingly, the motion for a new trial as to this issue was denied.

### D.

Defendant next argues that it is entitled to a new trial because the court erred in its charge to the jury. Specifically, it contends that the court failed to include one of defendant's requested points on the issue of

liability. As set forth below, there was no error, and defendant's contention is meritless.

The court's charge to the jury must accurately define the issues and correctly review the applicable law. *Cooper v. Bums,* 376 Pa. Super. 276, 283, 545 A.2d 935, 938 (1988), *allocatur denied,* 522 Pa. 619, 563 A.2d 888 (1989). However, the court is not required to use any prescribed language in formulating its charge and is not restricted to the precise points submitted by counsel. *Id.* Moreover, the court will not grant a new trial on the grounds of erroneous charges unless the instructions complained of are "fundamentally in error, and it . . . appear[s] that the erroneous instructions might have been responsible for the verdict." *Hawthorne v. Dravo Corp., Keystone Division,* 352 Pa. Super. 359, 368, 508 A.2d 298, 303 (1986), *allocatur denied, 514* Pa. 617, 521 A.2d 932 (1987) (quoting *McCann v.* Amy *Joy Donut Shops,* 325 Pa. Super. 340, 342, 472 A.2d 1149, 1150 (1984) (en banc)). Based on the above standards, it is clear that there was no error in the instructions.

Preliminarily, it must be noted that the court gave the standard charges for strict products liability. Regarding the definition of a "defect," the court instructed the jury as follows:

"The manufacturer of a product is the guarantor of its safety. The product must therefore be provided with every element necessary to make it safe for use and without any condition that makes it unsafe for use. If you find that the product at the time it left the defendant's control lacked any element necessary to make it safe for use or contained any condition which made it unsafe for use, then the product was defective and the defendant is liable for all harm caused by such defect." (N.T. 706.)

Moreover, after defendant objected to the charge, the court further instructed the jury that "a manufacturer is expected to design a product so that it will be safe

for its intended use." (N.T. 716.) Defendant did not object after the added instruction.

Defendant argues that these instructions did not fully convey the applicable law regarding liability. It contends that its requested point accurately explained the manufacturer's duty. Defendant asked the court to charge the jury that:

"(9) A seller or manufacturer is not expected to produce a product which incorporates only the ultimate in safety or design features. Werner Co., a manufacturer, is expected to design a product so that it will be safe for its intended use. A manufacturer is not required to design products which are foolproof or which are incapable of producing injury. A manufacturer is not required to impair the usefulness of its product or price itself out of the market by using only those design features representing the ultimate in safety design. *Azzarello v. Black Brothers Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978)." Defendant's requested point for charge no. 9.

However, the court's charge more properly reflected the applicable strict products liability law in Pennsylvania. As noted above, the court used the standard charge regarding the manufacturer's duty. The standard charges do not contain any language indicating that a manufacturer has no duty to design a foolproof product or use features representing the ultimate in safety design. Moreover, as plaintiffs argue, *Azzarello v. Black Brothers Co. Inc.,* 480 Pa. 547, 391 A.2d 1020 (1978), does not stand for the propositions outlined in defendant's requested point.

In *Azzarello,* the Pennsylvania Supreme Court held that a jury should not be instructed to find that a product is defective if it is "unreasonably dangerous" to the user. *Azzarello, supra* at 559, 391 A.2d at 1027. The court did not hold, or even state in dicta, the language in defendant's requested point-namely that a manufac-

turer does not have to design a foolproof product or use the ultimate safety design features. In fact, the court in *Azzarello* reiterated the holding in *Berkebile* that the jury should be instructed that a supplier must design a product that is safe for its intended use. *Id.* at 559, 391 A.2d at 1027. Thus, the court's charge to the jury fully and accurately conveyed the law on strict products liability, and there was no error in refusing defendant's requested point no. 9. Accordingly, the motion as to this issue should be denied.

### III.

Defendant next moves for remittitur or judgment notwithstanding the verdict arguing that the jury verdict was excessive and unsupported by the evidence.

### A.

It should first be noted that it is in the trial court's discretion whether to grant a motion for remittitur based on an allegedly excessive verdict. *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 290, 285 A.2d 451, 456-57 (197 1), *cert. denied,* 407 U.S. 920 (1972). However, the Pennsylvania Supreme Court has recently held that a jury award can only be reduced if it is "plainly excessive and exorbitant." *Haines v. Raven Arms,* 536 Pa. 452, 455, 640 A.2d 367, 369 (1994), *opinion supplemented,* 539 Pa. 401, 652 A.2d 1280 (1995). Further, the verdict must shock the court's sense of justice. *Id.* The Pennsylvania courts consider several factors in evaluating whether a jury award is excessive: (1) the severity of the injury; (2) whether the injury is objectively ascertainable via physical evidence; (3) the permanency of the injury; (4) whether it is possible to continue with employment; (5) the size of out-of-pocket expenses and (6) the amount of compensation demanded in the original complaint. *Harding v. Consolidated Rail Corp.,* 423 Pa. Super. 208, 225-26, 620

A.2d 1185, 1193 (1993). The courts need only apply those factors that are relevant to the case at hand. *Id.* An analysis of the relevant factors indicates that the jury award was not plainly excessive and exorbitant.

First, Mr. Slaughter's injuries were severe. His ankle required eight operations including a complicated grafting procedure. Second, the injuries were objectively ascertainable. Mr. Slaughter was required to wear a special shoe, and the jury saw photographs of his ankle. The photographs accurately depicted the ankle and visibly showed injury. Third, the injuries were permanent. Joseph Iannotti, M.D. testified that Mr. Slaughter has permanent physical limitations due to the injuries. (Iannotti videotape deposition transcript, pp. 50-51.) Further, Mr. Slaughter testified that he will have to wear special orthopedic shoes and use a cane for the rest of his life. (N.T. 122-24.) He also testified that he has chronic leg pain. (N.T. 119.) Mr. Slaughter was 37 years old at the time of the accident, and the life expectancy tables indicated he would live an additional 28.1 years from the date of the trial. (N.T. 343.)

Fourth, it is not possible for Mr. Slaughter to continue with employment. He explained that he tried several times after the accident to go back to work for Bell Atlantic in a sedentary capacity. (N.T. 113-19.) However, it was difficult for him to work due to his pain, and he was given disability status in 1992. (N.T. 118-19.) Further, Donald Jennings, Ph.D., plaintiffs' vocational expert, opined that Mr. Slaughter was not capable of full-time sustained employment. (N.T. 313.) Thus, in light of the relevant factors outlined in *Harding, the* jury verdict was not excessive.

### B.

Defendant also argues that a remittitur is proper because plaintiffs' expert used an inaccurate method to determine Mr. Slaughter's future wage loss. Plaintiffs'

economic expert, David Bunin, testified as to Mr. Slaughter's damages including future wage loss. To determine future lost earning capacity, Mr. Bunin used the total offset method. This method assumes that future increases in earnings due to inflation are offset by the interest rate so no reduction to present value is made. Defendant argues that this method is inherently flawed and resulted in an unfairly excessive verdict.

In support of its argument, defendant relies on a recent article by Robert J. Thornton, professor of economics at Lehigh University. The article criticizes the total offset method as being inaccurate because the inflation rate and interest rate are not generally equal. Robert J. Thornton, *Calculating the Present Value of Future Earnings in Pennsylvania; An Economist's Viewpoint on the Treatment of Productivity Growth, Pennsylvania Bar Association Quarterly,* January 1994 at 37. Thornton explained that the conclusion that the inflation rate and interest rate offset each other is unsupported. Thornton, *supra* at 38.

However, as defendant conceded in its brief and at trial, the total offset method was adopted by the Pennsylvania Supreme Court as the approved method to compute lost future earnings. *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980). In *Kaczkowski,* the court abandoned its previous approach which ignored the effects of future productivity and future inflation in determining future wage loss. *Id.* at 566, 421 A.2d at 1034. In its place, the court endorsed the total offset method under which the court does not discount the award to its present value. *Id.* at 579, 421 A.2d at 1036. The court was convinced that the total offset method provided an "efficient, predictable as well as accurate" method to compute lost future earning capacity. *Id.* Thus, in view of the Supreme Court's mandate *in Kaczkowski,* Mr. Bunin was correct in utilizing the total offset method to calculate Mr. Slaughter's future

wage loss. Therefore, defendant's motion for a remittitur was denied.

## C.

Defendant next argues that it is entitled to judgment notwithstanding the verdict because plaintiffs presented insufficient evidence in attempting to prove that the ladder was defective. Specifically, defendant points to parts of Dr. Vinson's testimony that are allegedly inaccurate and thus demonstrate that there was inadequate evidence to support a finding of a defect. While these arguments appear compelling at first, a close examination demonstrates that there was sufficient evidence of a defect.

Judgment notwithstanding the verdict is only proper in limited circumstances. It is an appropriate remedy where the evidence at trial was insufficient to support the jury's verdict. *Lilley v. Johns-Manville Corp.,* 408 Pa. Super. 83, 91, 596 A.2d 203, 206 (1991), *allocatur denied,* 530 Pa. 644, 607 A.2d 254 (1992). However, it can only be granted in clear cases where "no two reasonable minds could fail to agree that the verdict was improper." *Harding, supra* at 216, 620 A.2d at 1189. Further, in making this determination, the evidence must be viewed in the light most favorable to the verdict winner. *Id.* Applying these standards, defendant is not entitled to judgment notwithstanding the verdict.

Defendant alleges that Dr. Vinson committed three major errors. First, Dr. Vinson based his calculations of the ladder's load bearing capacity on the assumption that the side rails were constructed from a material called Extren. Dale King then testified that the side rails were not made of Extren but of a stronger more flexible product. (N.T. 397.) However, Dr. Vinson testified that finding that the material was not Extren would not necessarily affect his determinations because the

results would be the same. (N.T. 252.) Dr. Vinson further admitted that his calculations would be wrong if the material was not Extren but explained that his conclusion would still be the same. "But the thing is that if it is any other fiberglass, it is in that same order. And this is so badly defective that just changing those numbers 10 percent or so is not going to change any conclusions whatsoever." (N.T. 254.) Therefore, Dr. Vinson's assumption about Extren did not render the verdict improper.

Defendant next argues that Dr. Vinson erroneously detemined that the configuration of the fibers in the material used for the side rails were assembled in a longitudinal direction. Mr. King testified that the fibers run in random directions to provide reinforcement in all different directions. (N.T. 410.) Defendant argues that Dr. Vinson based his conclusions about the ladder's vertical and horizontal web strengths upon the incorrect determination of the fibers' direction.

This alleged discrepancy does not warrant judgment notwithstanding the verdict. The jury was presented with conflicting evidence on whether or not the ladder was defective. It is well-settled that it is the jury's role to assess the evidence, weigh the witness' credibility and accordingly make factual determinations. *Dawson v. Fowler,* 384 Pa. Super. 329, 333, 558 A.2d 565, 567 *(1989), allocatur denied,* 523 Pa. 636, 565 A.2d 445 (1989). The courts should not use judgment notwithstanding the verdict to invade that province. *Ludmer v. Nernberg,* 433 Pa. Super. 316, 322, 640 A.2d 939, 942 (1994).

Defendant lastly argues that Dr. Vinson erroneously concluded that the guide brackets on the fly section were in contact with the flange sections of the base side rails and served a load bearing function while the ladder was under load. While Dr. Vinson opined that there was contact, Mr. King and Dr. Westmann testified

that there was no contact between the brackets and the side rails. (N.T. 419-20, 645.) Thus, once again, the jury was presented with conflicting testimony.

However, the jury was actually given the opportunity to examine the ladder, including the brackets and side rails, while plaintiffs' counsel was on the ladder exerting a dynamic load onto the side rails. Given the jury's role to weigh the witness' credibility and resolve discrepancies in the evidence, their finding of a defect should be upheld. See *Dawson, supra* at 333, 558 A.2d at 567 (discussing jury's province to assess evidence). It cannot be said that the jury's conclusion was unsupported by the evidence or that "no two reasonable minds could fail to agree that the verdict was improper." *Harding, supra* at 216, 620 A.2d at 1189. Therefore, defendant's motion for judgment notwithstanding the verdict was denied.

